Filed April 10, 1885.

---

No. 10,480.

## WOLFE v. PUGH, ADMINISTRATRIX.

FRAUD. — *Conspiracy.* — *Exchange of Real Estate.* — *Rescission of Contract.*—
*Fraudulent Representations.*—*Pleading.*—*Complaint.*—A complaint for the· rescission of a contract for the exchange of real estate, which alleges,. in substance, that W. and two others, for the purpose of defrauding· plaintiff of a valuable farm, conspired together, and falsely and fraud-· ulently represented that W. was the owner of a certain tract of good,. tillable land, with valuable improvements thereon, desirably located in a certain county in another State, and worth a certain substantial sum, which he would convey to plaintiff in exchange for his farm and pay him a certain cash difference, and by falsehood and device impressed him with the desirability of the trade, without an inspection of the land; whereas such land is swamp land, wholly unimproved, situated in a different county from that represented, and·almost wholly worthless, of" all which plaintiff was ignorant until after an exchange of deeds, states a good cause of action.

SAME.—*Parties to Conspiracy.*—All who concur in and willingly and know-ingly become parties to, and further a conspiracy, are parties to it with-out proof of other or previous agreement to·concur in or further it.

| 101 | 293 |
|-----|-----|
| 128 | 57 |
| 101 | 298 |
| 132 | 247 |
| 101 | 293 |
| 165 | 632 |
| 101 | 293 |
| 169 | 314 |

SAME.—*Evidence.—Acts, Declarations and Representations of Co-Conspirator.*— The acts, declarations and representations of an alleged conspirator are not binding upon absent parties, nor competent evidence against them, until there has been proof of a conspiracy; but when that is established, such acts, declarations and representations become competent evidence against all parties shown to have been connected with such conspiracy, if in furtherance of that object.

SAME.—*Agency.*—There may be an agency, and also a conspiracy to defraud, between the same persons and relating to the same transaction.

SAME.—*Principal and Agent.—Liability of Principal for Fraud of Agent.*— Where a principal authorizes an agent to effect an exchange of lands with a third person, he is answerable for and is bound by the acts and representations of the agent, and the instrumentalities employed by him in accomplishing that end, even though the agent is guilty of fraud which the principal did not direct, and of which he did not have knowledge.

SAME.—*Evidence.—Rescission.*—The acts and representations of the agent in the way of inducing the third person to make the trade, and the acts and declarations of another, in the presence of the agent, who is used by him as a means of deceiving such third person, are competent evidence against the principal in an action for rescission.

PRACTICE.—*Objection to Evidence Before it is Given.*—It is not error for the trial court to overrule an objection to the testimony of a witness made before such testimony is given, and when the court can not know what it will be.

SAME.—*Motion to Strike Out.*—It is not error to overrule a motion to strike out certain evidence as a whole, where a part of it is competent.

SAME.—*Harmless Error.*—If a judgment is right upon the evidence, it will not be reversed because of erroneous instructions.

From the Sullivan Circuit Court.

*J. T. Hays, H. J. Hays, S. Coulson, T. J. Wolfe* and *J. M. Humphreys,* for appellant.

*J. C. Briggs, G. W. Buff, J. B. Patten, C. E. Barrett* and *J. T. Beasley,* for appellee.

ZOLLARS, C. J.—Charles E. Pugh was the plaintiff below, and based his action on the ground that he had been defrauded in a land transaction. Subsequent to this appeal Pugh died, and his administratrix has been substituted as appellee. The complaint may be epitomized as follows: Charles E. Pugh, a young man, inexperienced in business, owned two tracts of

land in Sullivan county, and was offering to sell an eighty-seven-acre tract, worth $2,000, so as to be enabled to pay off a mortgage upon the other tract. Knowing this, appellant, John E. Osborn, and Jesse Trueblood, for the purpose of cheating and defrauding Pugh out of his eighty-seven-acre tract, conspired and confederated together, and falsely, fraudulently and knowingly represented to him that appellant Wolfe was the owner of eighty acres of land in Crawford county, Illinois, five and one-half miles southwest of Robinson, the county seat of the county, which was good tillable land, with good and valuable improvements thereon, and worth $1,500. As a part of the conspiracy, and in furtherance of it, they proposed to Pugh that Wolfe would take his land and therefor give him the Illinois land and $500 in cash. Osborn, with the full knowledge of Wolfe, represented to Pugh that he knew a man, Trueblood, who would purchase from him the Illinois land at $1,150 cash so soon as the trade between Wolfe and Pugh should be consummated. Trueblood represented to Pugh that he knew of the Illinois land, as he had a brother who owned and lived upon an adjoining tract, and that so soon as Pugh should become the owner of the land, he, Trueblood, would give him $1,150 for it, and upon Pugh consenting, Trueblood gave to him a watch to bind the bargain. They also represented to Pugh that Wolfe wanted his land so as to exchange it for property nearer to him; that he had made a contract with one James McKee to take the land, and that to save the expense of two deeds Pugh and wife should make a deed direct to McKee. They also stated that Wolfe would execute a deed to Pugh for the Illinois land, and leave it with the county recorder to be delivered so soon as they could perfect the trade with McKee, and he paid the $700 " boot money" under their agreement with him, and that when McKee should have paid this money, the deed should be delivered to Pugh, and the $500 cash should be paid to him, and that Pugh could then complete his sale to Trueblood, and get from him the $1,150 for the Illinois land. Pugh and wife

executed their deed, conveying the land to McKee, and delivered it to Wolfe. Shortly after this the deed for the Illinois land was delivered to Pugh, and the $500 was paid to him by Wolfe. Pugh was ignorant of the quality, location and value of the Illinois land, and relied upon the representations of the other parties as to its quality, value and location, and relied upon Trueblood taking it from him at $1,150. All of their representations concerning the land were false and fraudulent, and known by the defendants to be such. Wolfe did not own land in Crawford county within five and one-half miles of Robinson. He owned eighty acres in Lawrence county, Illinois, which was not and is not tillable for any purpose, but, on the other hand, is swamp land, without any kind of improvements upon it, and is not, and was not, worth over $80. Of all this Pugh was ignorant until after the exchange was consummated and the deeds had been delivered. Upon an examination of his deed from Wolfe he learned for the first time that the land was not in Crawford county, and still subsequent to this he learned of the other frauds practiced upon him. He also learned for the first time, after the trade was consummated and the deeds passed, that Trueblood was financially worthless, and that his proposition to purchase the Illinois land was but a trick, in furtherance of the conspiracy to cheat him out of his land in this State. Upon learning of these frauds, Pugh tendered to Wolfe the $500, a deed of reconveyance of the Illinois land, and demanded a deed for the land conveyed to McKee.

This complaint clearly states a case in favor of Pugh. As to the Illinois land, the representations were not simply as to its value; they went further, and stated those things upon which value rests. The land was represented as being good, tillable land, with valuable improvements thereon, and situated within five and one-half miles of the county seat. It is averred that all of these representations were false and fraudulent, and known by the parties to be so; that the land was not thus situated, but was many miles away in another

county; that the land was not tillable for any purpose, was swamp land, without any kind of improvements, and hence almost wholly worthless. The part taken by Trueblood was well calculated to assist in misleading a man inexperienced in business affairs, impress him with the desirability of the trade, and turn him aside from going and making a personal inspection of the land for himself. But under the circumstances as detailed in the complaint, Pugh was not bound to go into another State and inspect the land. The parties, having represented to him the location and quality of the land, and the extent of the improvements, and thus gotten from him a valuable farm for almost nothing, can not turn upon him now, admit all of this falsehood and fraud, and, in refusing to make reparation, charge him with carelessness in accepting as true what they, by asseveration and device, sought to impress upon him as true. It does not lie with them to say that because he trusted to their word, instead of suspecting them of falsehood, they are entitled to the fruits of their falsehood, and he is without remedy. This is well settled by authority. *West* v. *Wright*, 98 Ind. 335, and cases there cited.

There was no error in overruling the demurrer to the complaint. The complaint, as will be observed, was filed against Wolfe, Osborn and Trueblood. Trueblood was defaulted. No further notice seems to have been taken of him in the subsequent proceedings. Osborn was not found. The case proceeded to trial and judgment against Wolfe alone.

He assigns as error here the overruling of his motion for a new trial, and under that assignment argues that the evidence is insufficient to sustain the verdict and judgment, and that the trial court erred in the admission of certain testimony, and in giving and refusing certain instructions.

The plaintiff, Pugh, was a witness, and detailed the transaction, in substance, as follows: When in Sullivan, on the 4th day of April, 1881, he met and had a conversation with John E. Osborn on the street; being asked by Osborn whether he would sell his land, he answered that in order to

get money to pay off a mortgage upon another tract, he would sell it for $1,700 cash; Osborn said that he had eighty acres of land in Illinois to sell for appellant, Wolfe, and upon being asked by Pugh as to its location, said that it was five and one-half miles southwest of Robinson, in Crawford county; that it was high, rolling prairie, and as good land as a "crow ever flew over," and worth eighteen hundred dollars; that the fences upon it had been burned; that he knew a man by the name of Trueblood, who had sold land for $1,200, and wished to buy land in Crawford county, Illinois, and that Pugh, if he became the owner of Wolfe's land, could sell it to Trueblood for $1,200 cash; that he, Osborn, would see Trueblood for him, Pugh, about the matter, and that if he, Pugh, would come to Sullivan on the following Wednesday, he and Trueblood could go by rail to Robinson, get a "rig" there and go and see the Wolfe land. At that time, Pugh had never seen Trueblood. In the evening of the day on which this conversation was had, Pugh, at the request of Osborn, went with him to see Wolfe at his store. Pugh told Wolfe that Osborn had said that he, Wolfe, would exchange his land for Pugh's, and give to him as a difference, $500. Wolfe answered that he would do so; to go on and make the trade, and he would stand good for it; that he was busy in the store, and as a member of the grand jury, and had gotten Osborn to make the trade for him. Upon being asked by Wolfe, how long it would take him to decide as to the trade, Pugh answered that he would decide so soon as he could go and look at the Wolfe land, as he had a man to take it off his hands. And in answer to a question as to how they were going, Pugh answered that they would go by rail to Robinson, get a "rig" there and go and see the land. Wolfe then said, "Hurry up; if we trade, I want to do so and not fool about it," and then walked away.

On the following Wednesday evening, Pugh saw Wolfe at his store, and asked for Osborn. Wolfe answered that he had sent him to look at Pugh's farm, and that he would return in

a short time. On his way to the hotel Pugh met Osborn and Trueblood, and said to them that he and Trueblood would go and see the Wolfe land. Trueblood said that was of no use, as he had just come from the land, and knew all about it, and that he would give for it $1,000 in cash and his note for $150; that he wanted to keep $200 of the amount for which he had sold his land to build fences on the Wolfe land. He gave to Pugh a silver watch to bind the bargain, and said that to give time for Pugh to perfect his trade with Wolfe he would meet him on Saturday or Monday following, and close up the purchase. Pugh called on Wolfe on the following morning and asked him about his Illinois land. He answered that it was good land; that he had been on it; that the only trouble was the fences had been burned; that he would not trade but for the fact that he could exchange Pugh's farm for property in Sullivan, near to him. Pugh said he was ready to exchange deeds. Wolfe answered that he would write his deed, and that Pugh should have his made to McKee. Subsequent to this Osborn and Pugh called Wolfe from the grand jury room, and showed him Pugh's deed. Wolfe handed the deed to Osborn and told him to go and deliver it to McKee and get the money, and asked Pugh to wait for his $500 until the return of Osborn, as that would relieve him of the trouble of getting it elsewhere. Said he would let the county recorder hold his deed until the return of Osborn. Pugh asked him if his deed was all right, to which he answered that it was, and that if it was not he would make it right. On Friday following Pugh met Wolfe and Osborn in the recorder's office. Wolfe there paid to him the $500, and also gave to Osborn some money. The recorder then handed to Pugh the Wolfe deed. As they all left the court-house, Pugh remarked that he must get his deed from Wolfe recorded. Wolfe turned, took the deed from Pugh, saying that he had a cousin in Illinois, and would send the deed to him to have recorded. They all went to Wolfe's store. At the request of Pugh, Wolfe wrote from the deed a description of the Illinois land. From this, for the first time, Pugh

learned that it was located in Lawrence, and not in Crawford county. He mentioned this fact to Wolfe, who answered that if he had been asked about the matter he would have told him that the land was in Lawrence county. While Wolfe and Pugh were talking Osborn went to the bank. These deeds were made on the 7th day of April, 1881. On the 14th day of the same month Pugh demanded a rescission of the contract, and made the proper tenders, etc. Trueblood was a lightning-rod peddler, and utterly worthless financially. Osborn was no better. A few days after the trade Osborn left for Kansas, and is still absent.

The evidence shows conclusively that Pugh's land was worth between $1,700 and $2,000; that Wolfe's was not worth over $100, and that every representation concerning it was false.

W. G. Brodus testified that before the consummation of the trade, and in the absence of Wolfe, Osborn told him that he, was trading Wolfe's land to Pugh, and wanted to buy a watch to give to Trueblood to bind the bargain between him and Pugh; that he had not time to get the money from Wolfe; that he had had Sol Walls to assist him in making the trade with Pugh, but he was not as efficient as Trueblood. The witness sold the watch to Osborn for $8, which Trueblood afterwards gave to Pugh.

Another witness testified that prior to the trade Wolfe told him that he thought the trade would be made.

Park Beard testified that a short time before Osborn went away he saw him in Wolfe's store in close conversation with Wolfe. He said he had been helping Wolfe make the trade, and had made $1,000. Wolfe replied : " Yes, he made a nice thing."

Wm. Joyce testified that on the day the trade was made, he had a conversation with Osborn in Pugh's presence, in front of Wolfe's store, but in the absence of Wolfe, in which conversation Osborn made representations as to the location, quality and value of the Wolfe land.

James McKee testified that Osborn came to his house in the country on Wednesday before the trade, and said that he had traded for Pugh's land, and wanted to sell it to him; said he had just come from Illinois, and wanted to sell the land to start a grocery store. McKee offered him $700 in cash and his notes for $600. On the next day Osborn went to McKee with the Pugh deed, and wanted the money and notes. McKee declined to pay anything until he could examine the title to the land. Osborn requested him to go to Sullivan early the next day, as he wanted to purchase his stock of groceries. On the next day McKee went to Sullivan, and on seeing that the deed was from Pugh to him, reminded Osborn of his statement that he owned the land, and declined to make any payment until he could see Pugh. Osborn answered that the deed was thus made to save expense. McKee finally put the money and notes into the hands of the county recorder, to be delivered to Osborn if Pugh should say that it was all right. McKee never owned any property in Sullivan.

Calvin Bunch testified that before the trade was made, he asked Osborn for money on a debt. Osborn told him that so soon as he finished a trade he was making for Wolfe, he would pay; that he had a d—d nice thing; that he was selling some land for Wolfe, and would make four or five hundred dollars. Wolfe was not present at this conversation. Subsequent to this, the witness saw Wolfe and Osborn in close conversation in Wolfe's store.

A. Mitchell testified that one day Wolfe was late in getting to the grand jury room, and excused his tardiness by saying that he had made more by trading than he could as a grand juror.

The county recorder testified that McKee left with him $700 in money and his notes for $600. Wolfe, Pugh and Osborn having met in his office, he handed $500 to Wolfe, and he paid it over to Pugh. The balance of the money and notes he gave to Osborn.

Daniel Spilkey testified that before the trade he had a

conversation with Osborn at his house, in the absence of Wolfe, and in the presence of Trueblood. Upon being asked to pay a debt to witness, Osborn said that he could pay as soon as he completed a trade they were making for Wolfe. The witness then told Osborn that he knew Wolfe's land, and that it was worth nothing. Osborn answered that they did not care for that, that they intended to swindle some one. The next day the witness met Osborn on the street, and again asked him for money. Osborn said he had made the trade, and had the money in his pocket; that he had made $250 and a suit of clothes. Wolfe was a dealer in clothing.

H. K. Wilson testified that after the $500 had been paid to Pugh by Wolfe, either Wolfe or Osborn said to the other, "Let us go and fix that," and that thereupon they left the recorder's office, followed in a few minutes by Pugh.

W. C. Shattuck testified that he sold the Illinois land to Wolfe, and that Wolfe wanted him to take it back, because it overflowed.

Miles Miller, another witness, stated that he saw Wolfe and Osborn in the recorder's office. Osborn said he was making a land trade for Wolfe and was to get $250 for his services, to which Wolfe answered: "Yes, and your money is ready as soon as you get through." Upon hearing this, the witness crossed the street and informed his brother, to whom Osborn was indebted.

We have thus set out the substance of the most material evidence in favor of appellee. It is true that appellant squarely denied the whole of it, but it was for the jury to determine to whom credence should be given. They seem to have given credit to appellee's witnesses in preference to appellant. We can not disturb the preference.

There can be no question that Pugh was defrauded out of his farm. The representations made and devices resorted to were well calculated to throw off his guard, mislead and deceive a person much more experienced in business affairs than Pugh was.

Wolfe's representations and conduct, aside from Osborn and Trueblood, it may well be said, were such that he ought not to be heard to say that Pugh was the loser by his own fault. He had been upon his Illinois land and knew that it was practically worthless, because of overflows, and yet he represented to Pugh that it was good land. He represented as a reason for making the trade, that he could exchange Pugh's land for town property near him, and yet he must have known that McKee owned no town property to exchange.

When Pugh told him that he would go by rail to Robinson, and there get a "rig" and go and see the Illinois land, he knew that the land could not be thus reached because it was situated in another county, and yet he did not inform Pugh of that fact, but urged haste in the consummation of the trade. Withholding his deed until Pugh's was delivered, and then taking it with an offer to send it for record, before Pugh had examined it, indicates a desire to keep Pugh in ignorance of the true location of the Illinois land until it would be too late for him to recall his deed, because of its delivery to McKee. There is no reasonable doubt that Osborn was acting for Wolfe in bringing about, and consummating the trade. And from the whole evidence, we can not say that the jury might not well have concluded that Wolfe conspired with Osborn and Trueblood to cheat and defraud Pugh. If there was such a conspiracy, or if Osborn was Wolfe's agent to sell his land, his acts and representations, and the acts and representations of Trueblood connected with the transaction, were competent evidence against Wolfe.

It may be conceded, as contended for by appellant's counsel, that if Osborn was an agent, he was a special agent, and could not bind Wolfe beyond the scope of the agency; but it does not follow from this that his acts and representations in bringing about and consummating the trade, are not binding upon Wolfe. Having given Osborn authority to bring about and consummate the trade, Wolfe must be bound by his acts, statements and representations in accomplishing that end.

When a principal authorizes an agent to do a certain thing, he is answerable for and bound by the acts and representations of the agent in accomplishing that end, even though the agent is guilty of fraud in bringing about the result. Having given such authority, the principal is responsible for the fraudulent as well as the fair means used by the agent, if they are in the line of accomplishing the object of the agency. Having put the agent in a position where he may perpetrate a fraud upon innocent third parties, the principal will not be allowed, as against such third parties, to retain the fruits of the fraud and defeat a claim for reparation by saying that he justifies the end, but not the means used by the agent. Conceding that the principal is innocent of any active fraud, yet, when a case arises that he or an innocent third party must suffer by the fraud of the agent, the principal who conferred authority upon the agent must suffer the loss rather than the innocent third party. This the principal may generally avoid by submitting to a rescission of the contract, and restoring what he may have received as the fruit of the agent's bad faith. To thus bind the principal by the fraud of the agent is not to bind him beyond the scope of the agency. In such case, the agent does not exceed his authority, but perpetrates a fraud in the exercise of his authority to accomplish the object of the agency, and in such case the principal is liable for the fraud, although he may not have directed it nor had knowledge of it. The fraud of the agent becomes the fraud of the principal as to third parties. *Eilenberger* v. *Protective Mut. Fire Ins. Co.*, 89 Pa. St. 464; *Tagg* v. *Tennessee Nat'l B'k*, 9 Heisk. (Tenn.) 479; *Reynolds* v. *Witte*, 13 S. C. 5; S. C., 36 Am. R. 678.

The holding in the case of *Law* v. *Grant*, 37 Wis. 548, is summed up in the syllabus as follows: "If an agent effects a sale of land of his principal by false representations or other fraud, without the authority or knowledge of the principal, the latter is chargeable with such fraud in the same manner as if he had known or authorized it. If the vendor of land knows *when he effects the sale*, that the purchaser has been in-

duced to buy by the false and fraudulent representations of a third person, he is responsible for the fraud, though such third person was *not his agent.*"

In the case of *Bennett* v. *Judson*, 21 N. Y. 238, the court said : " There is no evidence that the defendant authorized or knew of the alleged fraud committed by his agent Davis, in negotiating the exchange of lands. Nevertheless, he can not enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing it to a consummation. If an agent defrauds the person with whom he is dealing, the principal, not having authorized or participated in the wrong, may no doubt rescind, when he discovers the fraud, on the terms of making complete restitution. But so long as he retains the benefits of the dealing he can not claim immunity on the ground that the fraud was committed by his agent and not by himself. This is elementary doctrine."

See, also, the case of *Nelson* v. *Cowing*, 6 Hill, 336, where it was held, overruling the case of *Gibson* v. *Colt*, 7 Johns. 390, that an agent authorized to sell an article is presumed to possess the power to warrant its quality and condition unless the contrary appear; and this, whether the agency be general or special; and that the principal will, in such case, be affected by the *fraudulent representations* of the agent in making the sale. See, also, Story Agency, section 452 and note, and cases there cited.

As we have said, the evidence shows clearly that Osborn was acting for Wolfe. To say the least, he represented him as agent in bringing about and consummating the trade. His acts and representations, in the way of inducing Pugh to make the trade, became the acts and representations of Wolfe. He could not delegate authority to Trueblood to act for Wolfe, without his authority or sanction, but he could use him as a means of deceiving Pugh, and this he did. It was proper, therefore, to prove all of Osborn's acts and representations to Pugh and in his presence, and the acts and

declarations of Trueblood in the presence of Pugh and Osborn. What Trueblood did and said in the presence of Pugh and Osborn, became the acts and declarations of Wolfe the principal. The acts, declarations and representations by Osborn and Trueblood were in the one endeavor to induce Pugh to forego an examination of Wolfe's land, and enter into the trade. The buying of the watch by Osborn, and the giving of it to Pugh by Trueblood, were clearly a part of the same scheme to prevent an inspection of Wolfe's land by Pugh. These several acts, the declarations, and representations by Osborn and Trueblood to Pugh, or in his presence, were competent evidence against Wolfe. They were the means by which the trade was effected, and by which Wolfe got from Pugh his farm without adequate consideration.

A part of the testimony of Brodus, Joyce, Bunch and Spilkey consisted of statements that Osborn told them that he was selling the land for Wolfe. Appellant contends that these statements tended to prove the agency of Osborn, or a conspiracy between the parties, and that for either purpose they were incompetent, as neither an agency nor a conspiracy can be proven, as against an absent party, by the declarations of an alleged agent or conspirator. This is doubtless the rule of law well settled, and if objections and, exceptions to the testimony had been properly made and saved, they would challenge serious consideration. · But we think that as the objections were made and exceptions saved, the court below did not err in admitting the testimony, and that the exceptions saved present no available error. In each case, the witness was asked whether or not he had had a conversation with Osborn, and, upon answering that he had, was requested to give it. At this point, appellant interposed his objections, stating, with other grounds, that the declaration of an alleged agent or conspirator is not competent to prove the agency or conspiracy. These objections were overruled, and appellant excepted. At this juncture, the trial court did not and could not know what the testimony of the wit-

nesses might be, and hence did not err in overruling the objections. The witnesses were allowed to give the conversations with Osborn, and, as they proceeded, stated what he had said about selling the land for Wolfe. No objections were made to these statements, nor to any other statements, as they came from the witnesses. After they had all testified, appellant moved the court to strike out and withdraw from the jury all conversations with and statements and declarations by Osborn in the absence of Wolfe, because no agency nor conspiracy had been proven. This motion was properly overruled.

In the first place, an agency at least had been clearly established. In the second place, as we have said, the jury might well have found from the evidence that there was a conspiracy to cheat and defraud Pugh. And, in the third place, the motion included all of the conversations of Osborn with Pugh, some of which was clearly competent. If any of the evidence was competent, it was not error to overrule a motion to strike out the whole of it. These observations apply equally to all of the evidence which appellant contends in argument was incompetent.

It is also urged in argument that some of the statements by Spilkey were of conversations with Osborn after the trade was consummated, and his agency hence at an end. Here again the objections were made in the same way, and are not, therefore, available. It may be proper to say, however, that the evidence tends to show that the agency had not terminated, as Osborn and Wolfe had not yet closed up the transaction by a division of the proceeds, which they afterwards made at a bank. See *Adams* v. *Davidson*, 10 N. Y. 309.

What we have said as to the competency of the acts of Osborn and Trueblood, and their declarations and representations to Pugh, is equally applicable upon the theory of a conspiracy to defraud Pugh. Such acts, declarations and representations by an alleged conspirator are not binding upon absent parties, and hence are not competent evidence against

them, until there has been proof of a conspiracy. When that is established, such acts, declarations and representations become competent evidence against all parties shown to have been connected with the conspiracy, if in furtherance of that object. Without extending this opinion, it is sufficient to say that in our opinion the evidence of a conspiracy was such as to make the acts, declarations and representations of Osborn and Trueblood competent evidence against appellant. See Whart. Ev., section 1205. And whether we regard the case as one of agency on the part of Osborn, or one of conspiracy, the evidence is such that we can not reverse the judgment upon the weight of the evidence. There might have been an agency, and also a conspiracy to defraud Pugh; the two are not at all inconsistent. A conspirator, in a certain sense, acts as the agent of his co-conspirators.

Appellant's interpretation of the sixth instruction is not a fair one, for the reason that he dissects it into parts, and assails the parts separately. An instruction, as we have many times decided, is to be taken as a whole. Taken as a whole, this instruction states as a legal proposition that all who accede to, concur in, and willingly and knowingly become parties to and further a conspiracy, are parties to it, without proof of further or previous agreement to concur in and further it. Thus interpreted, the instruction states the law correctly. *Daniels* v. *McGinnis*, 97 Ind. 549; *People* v. *Mather*, 4 Wend. 229.

Many objections are urged to other instructions given by the court, all of which we have carefully examined and considered, and conclude that they are not such as would justify a reversal of the judgment. It would extend this opinion to an undue length to follow counsel in their elaborate argument and meet each objection separately. It is manifest that some of the instructions did not influence the jury to the prejudice of appellant. The damages, for example, as returned by the jury, are less than the difference between what Pugh asked for his land and the value of appellant's land; and less, also,

than the difference between the value of Pugh's land and the land of appellant.

The fourth and fifth instructions upon the question of fraudulent representations as to the value of land may not state the rule correctly under the decisions of this court, but we do not think that the judgment should be reversed on that account. The statute commands that this court shall not reverse a judgment where it shall appear that the merits of the cause have been fairly tried and determined in the court below. R. S. 1881, section 658. Under this section it has been many times held that if the verdict and judgment are right upon the evidence, the judgment will not be reversed because of erroneous instructions. *Burton* v. *Calaway*, 20 Ind. 469; *Wood* v. *Ostram*, 29 Ind. 177; *Roberts* v. *Nodwift*, 8 Ind. 339; *Lafayette, etc., R. R. Co.* v. *Adams*, 26 Ind. 76; *Brooster* v. *State*, 15 Ind. 190. In our judgment the verdict and judgment in this case are clearly right upon the evidence, and the rule of the statute and decisions should be applied in support of the judgment.

Of the instructions asked by appellant the court refused some, gave some as asked, and others with modifications. We have carefully examined all of them, and noted the argument of counsel, and are not convinced that any error was committed which would justify a reversal of the judgment; nor that appellant suffered any injury by the action of the court of which he can complain. So far as the instructions refused state the law applicable to the evidence correctly, they are covered by instructions given by the court, and as applicable to the evidence in the case, we think that the modifications were properly made.

Having found no error in the record for which the judgment should be reversed, it is affirmed, with costs.

Filed April 22, 1885.