KOSTOFF, ET UX. *v.* MEYER-KISER BANK, TRUSTEE.

[No. 25,560. Filed August 13, 1929. Rehearing denied and mandate modified December 3, 1929.]

*Alvah J. Rucker* and *B. Howard Caughran,* for appellants.

*Jacob S. White* and *T. Wilson Annabal,* for appellee.

MARTIN, J.—This is an appeal from a judgment for $1,812.61 on two promissory bonds (notes), executed by Nascho Kostoff to the Meyer-Kiser Bank, one for $500 and one for $1,000, each with interest coupons attached, and for the foreclosure of a mortgage, executed by Kostoff and his wife securing the same. To the complaint, which was in the usual form, the appellants filed an answer in three paragraphs, the first, a general denial, the second, a plea of payment, and the third, an answer setting up a partial failure of consideration. Replies in general denial were filed to the second and third paragraphs of answer. The error relied upon for reversal is the overruling of appellants' motion for a new trial, for the reason that the decision was not sustained by sufficient evidence and was contrary to law.

The third paragraph of answer alleges that, by reason of the fact that $1,100 of the mortgage loan was to be

retained by the appellee as security for a bond to be furnished by appellee for the release of a relative of appellants' who was being held by the United States immigration authorities in the State of Florida, and that appellee failed to provide such bond, that such relative was not released but was deported; that said $1,100, being a part of the $1,500 covered by the notes and mortgage, was never received by appellants nor by anyone authorized by them to receive the same; and that, to the extent of said $1,100, said notes and mortgage were without consideration. This paragraph prayed for the cancellation of $1,100 of said notes and mortgage.

It appears from the evidence that William Evans, or Evanovitch, a Serbian, was employed at a regular salary of $150 per month by the appellee company as its agent to secure and conduct business with people of foreign birth in Indianapolis and vicinity. Appellant Nascho Kostoff, a Bulgarian, met Evans in a pool room in Haughville (a suburb of Indianapolis), and was induced by Evans to help him "do a big business for the bank" and to make deposits in the appellee bank. Evans delivered a bank book to Kostoff with his deposit properly credited, and later, upon several occasions, took sums of money to the bank for Kostoff.

Thereafter, Kostoff, with another foreigner, met Evans in Military Park and told him (in the Bulgarian language) that Kostoff's brother-in-law was held in jail at Tampa, Florida, by the immigration authorities, and that it was necessary, in order to secure his release, for Kostoff to secure cash or a bond for $1,000 to send to Tampa. Evans represented to Kostoff that the appellee company, for whom he worked, had a "big bond department," and that, if Kostoff would mortgage his home to the company, the company would either make the bond itself or procure a surety company or some other person to make it, or would send the money to

Tampa as a cash bond for the brother-in-law, and that the latter would be in Indianapolis within 10 days. Evans then took Kostoff to the appellee bank, introduced him to the vice-president, the cashier, the attorney, and to the assistant to the president, and to other officers and agents. Kostoff told the vice-president in imperfect English his purpose, and, at the vice-president's suggestion, Evans wrote out an application for a mortgage on appellants' property, which Kostoff signed. Evans was sent by the appellee to the holder of a prior mortgage and brought him back to the bank to receive his money and to release his mortgage of $400. Evans also was sent by the appellee to Kostoff's home (with a notary public) to take the acknowledgement of Mrs. Kostoff to the mortgage, which he returned to the bank. The appellee also prepared and sent through Evans to Kostoff, at his home, a written order authorizing it to pay off the $400 mortgage, which order Kostoff, at his direction, signed. After the delivery of the check for the balance of $1,001.12, Evans, the agent of appellee, cashed the same, absconded with the money, and has not been heard of since. (Although not affecting the issues in this case, it is noted that a bond of the Fidelity Casualty Company guaranteed the bank against his dishonesty.) After about six days, Kostoff received a "good-bye" letter from his brother-in-law, who upbraided Kostoff because, the bond not having been put up, he was sent back and was on his way to the old country.

The appellee contends that the contract between it and appellants Kostoffs was not made through its agent Evans, but that the agency of Evans was terminated when he took Kostoff into the bank and introduced him to its officers, and that thereafter, Kostoff dealt directly with it; that it had no power or authority to issue a bail bond, and that its vice-president expressly told Kostoff

it would do nothing except lend him money on mortgage; that the entire loan transaction was completed prior to the time Evans took the check from Kostoff and received the money on it from appellee, and that, therefore, Evans was not acting as the agent of the bank when he stole the money.

If appellee's contention was correct that the loan transaction was completed prior to the time Evans took the money, then Kostoff would have to pursue a different remedy, and he and his wife could not make their defense in the proceeding to foreclose the mortgage. We believe, however, that but one transaction was involved, and that Evans' act in taking the money was as much a part of it as were his representations to Kostoff that the bank would do all that was necessary and would have his brother-in-law here in 10 days.

The appellee's testimony shows that the check for $1,001.12 was delivered by Miss Fisher, assistant to the president of appellee, to Nascho Kostoff in the bank in the presence of Evans, while appellants' testimony is that the check was brought by Evans, two days later, to him at his home where he was ill. This conflict in the evidence is not material; the fact remains even under the evidence most favorable to appellee, that Evans, while acting as the agent of the bank and within the apparent scope of his authority, took Kostoff's money. Whether Kostoff had manual possession of the appellee's check for $1,001.12 for a short time can make no difference. The appellee cashed the check when it was presented and turned the money over to Evans. Even if the check was handed over by Miss Fisher to Kostoff, Kostoff, in indorsing and handing it over to Evans, did not thereby make Evans his agent. Evans had, on several former occasions, accepted money from Kostoff for the bank, and he was still the agent of the bank. During the transaction of execut-

ing the mortgage, in which Evans as agent exercised full authority, the latter created the opportunity for the fraud which was perpetrated, and the bank is liable therefor. *Day* v. *Dages* (1897), 17 Ind. App. 228, 46 N. E. 589.

Appellee has devoted considerable space in its brief and time in the oral argument to the propositions: that an agent cannot bind his principal to do an act which the principal cannot do; that he cannot bind a private corporation principal to perform an *ultra vires* act; and that state banks and loan and trust companies are not empowered to execute bail or recognizance bonds as surety. But we do not believe any question of the authority of appellee to execute a bail or a recognizance bond is here involved. The appellee need not have executed such a bond in order to carry out the agreement made by Evans with Kostoff, for it could have procured the execution of such a bond or could have transmitted the cash or collateral for the desired purpose. §3950 Burns 1926. Its vice-president testified that the bank, if it had wanted to, could have procured the bond for the brother-in-law.

The appellee sought by the testimony of its vice-president to avoid the effect of the representations and promises of its agent Evans. The vice-president testified that Evans brought Kostoff into his private office, introduced him, and said that Kostoff needed $1,000 to get his brother-in-law out of jail somewhere; that he owned a good piece of property on Blake Street, on which he had a $400 mortgage, and asked if the bank would be interested in making Kostoff a loan so he could get this $1,000; that the vice-president said "certainly, we make anyone a loan on a good property, if it is adequate security for the money . . . of course, I have not, . . . I don't know what he does with the money after he gets it, all we can do is make him the

loan," and then said "make application for the loan," which applicant did, with the assistance of Evans. It is true that the vice-president did not tell Kostoff that the bank would take the money derived from the loan and hold it as security to obtain a bond to send to get his brother-in-law out of detention and that Kostoff did not ask him to do anything of that kind. But he did not need to do so, for the appellee's agent Evans had already made this agreement for the bank, acting clearly within the apparent scope of his authority. Appellant had no need for the money except for the purpose of securing the release of his kinsman, which appellee by its agent undertook to procure, and the loan would not have been made except for the agreement to secure such release. Such agreement was the consideration for the note and mortgage. Appellee should not be permitted to accept the benefits of the agency without being bound for the acts and representations of the agent in securing those benefits. This court, in *Wolfe* v. *Pugh, Admx.* (1894), 101 Ind. 293, well stated the rule applicable to this situation as follows:

> "When a principal authorizes an agent to do a certain thing, he is answerable for and bound by the acts and representations of the agent in accomplishing that end, even though the agent is guilty of fraud in bringing about the result. Having given such authority, the principal is responsible for the fraudulent as well as the fair means used by the agent, if they are in the line of accomplishing the object of the agency. Having put the agent in a position where he may perpetrate a fraud upon innocent third parties, the principal will not be allowed, as against such third parties, to retain the fruits of the fraud and defeat a claim for reparation by saying that he justifies the end but not the means used by the agent. Conceding that the principal is innocent of any active fraud, yet, when a case arises that, he or an innocent third party must

suffer by the fraud of the agent, the principal who conferred authority upon the agent must suffer the loss rather than the innocent third party."

In *Goshorn* v. *People's Nat. Bank* (1903), 32 Ind. App. 428, 69 N. E. 185, 102 Am. St. 248, a depositor concluded to do as directed and executed a check in the form of a receipt, delivered it to the cashier, with instructions to deposit the amount named in the trust company suggested. No remittance or deposit was made, the cashier using the receipt to cover up his own previous embezzlement, and it was held that the bank was liable for the amount of the check, the court saying:

"Appellee selected its own cashier, and held him out to the world as deserving of confidence. Those who deal with persons occupying such responsible positions have a right to rely upon their integrity, and do so constantly. Depositors do not deal at arm's length with the cashier. In language used by Justice Paxon of the supreme court of Pennsylvania, 'It would be monstrous to allow them to take advantage of the ignorant and unwary, by reason of their position and the confidence it inspires.'"

The appellee here has failed to show that Evans was a special and not a general agent. The vice-president of appellee testified that Evans "was supposed" to solicit savings accounts from foreign-born people, to sell them investment securities and mortgage bonds and to solicit mortgage loans, but there was no evidence as to any limitation on his authority. The vice-president testified that full instructions were given Evans by the cashier, but neither the cashier nor any other witness testified as to what these instructions were.

In *First Nat. Bank* v. *Josefoff* (1914), 57 Ind. App. 320, 105 N. E. 175, the appellee, at the solicitation of one Picar, a clerk in the appellant bank, deposited a sum of money with the bank, receiving as evidence thereof a

receipt signed by Picar personally, and the question involved was as to whether the money was deposited with the bank, or with Picar. The appellee was a Macedonian and could not read the English language. The money was delivered to Picar in the bank in which he was employed as an interpreter and had charge of the foreign exchange department. Holding the bank liable the court said:

"It is the apparent or ostensible authority which controls in cases of this kind rather than any special instructions which may have been received by the officers and agents of the bank. By placing Picar in the position in which he was at the time of receiving the money from appellee, the bank accredited him to the public; and, if he violated his instructions and a loss ensued, it must be borne by the bank. (Citing authorities.) Even though it be conceded that the bank was not at fault with reference to the transaction in question and that the appellee was also blameless, and that the loss was occasioned solely through the fault and misconduct of Picar, still the bank was responsible for Picar being placed in a situation where he was enabled to perpetrate the fraud. It is well settled that where one of two innocent parties must suffer loss through the wrongful act of a third person, the loss must fall upon the one who placed such third party in a position by means of which he was enabled to commit the wrong which occasioned the loss."

In the Josefoff case, the court remarks that the appellee could not read the English language, and that the position of Picar in the bank was such as would inspire confidence on the part of appellee, and Picar's statements to the effect that the money was safe were of such a character as to mislead the appellee. So, in the instant case, not only could appellant Kostoff not read or scarcely understand the English language, but Kiser and the other officers of the bank knew of such ignorance and

illiteracy and of the fact of his foreign birth, for they had been introduced to him by Evans, and had heard him try to talk. Evans was employed because of the fact that those who could converse with him in their native tongue would have confidence in him, and the more so because he was the accredited agent of appellee bank.

When a bank holds out even a minor official as being entrusted with certain powers and duties, his acts within the scope of such apparent powers are binding on the bank. 7 C. J. 559; *City Nat. Bank* v. *Martin* (1888), 70 Texas 643, 8 S. W. 507, 8 Am. Rep. 632; *Munn* v. *Burch* (1860), 25 Ill. 35; *First Nat. Bank* v. *Josefoff, supra.*

The judgment is reversed, with directions to sustain appellant's motion for a new trial.

## ON PETITION FOR REHEARING AND MODIFICATION OF MANDATE.

PER CURIAM.—Appellee's petition for rehearing and brief supporting the same reiterate the propositions heretofore made by it, but, upon careful consideration thereof, we conclude that the decision already reached is correct, and the petition is therefore denied.

Point 6 of such petition is as follows:

"If the court should decide that this petition [should] be denied, its mandate heretofore entered herein should be modified in that the judgment of the trial court is valid to the extent of Four Hundred ($400.00) Dollars expended by appellee in satisfaction of a prior mortgage loan on the mortgaged premises."

The appellant has also filed a motion to modify the mandate in which he asks that the cause be not remanded for a new trial, but with direction to the trial court to forthwith enter judgment in his favor. It appears to this court that the facts surrounding the transaction

in question were completely developed at the trial, and that, since there is no material conflict in the evidence, the ends of justice would better be served by a mandate which will end this litigation.

The appellee in its petition has made no suggestion regarding either interest or costs. It would be manifestly unjust to require the appellant to pay the costs, either below or upon appeal. It is clear that appellee is entitled to recover the $400, and since appellants, at or before the trial, made no tender of that sum with interest, the appellee is also entitled to interest at the legal rate from the date the $400 was furnished to the date of the final judgment.

The mandate heretofore entered is, therefore, modified as follows:

The trial court is directed to set aside its judgment heretofore entered in this cause and to render judgment in favor of appellee against appellants in the sum of $400, together with interest at the rate of six per cent per annum from October 18, 1924, and no more, and for foreclosure of the mortgage in such sum only, and to tax all the costs to the appellee. All the costs of this appeal are taxed to the appellee.