### SIMECEK v. UNITED STATES NAT. BANK OF OMAHA, NEB.
### BARTELHEIM v. SAME.
#### Nos. 10834, 10835.

Circuit Court of Appeals, Eighth Circuit.
July 22, 1937.

David A. Fitch and M. L. Donovan, both of Omaha, Neb., for appellants.

Edgar M. Morsman, Jr., and A. C. Munger, both of Omaha, Neb., for appellee.

Before WOODROUGH, THOMAS, and FARIS, Circuit Judges.

THOMAS, Circuit Judge.

Both these cases arose out of the same general transaction; they were consolidated for trial, and are presented here on one record and bill of exceptions. At the close of appellants' evidence the court, sustaining motions by appellee for directed verdicts, entered the judgments of dismissal here complained of on the ground of want of jurisdiction.

Both appellants in their petitions claim damages for losses suffered as victims of a conspiracy to defraud them and others. The evidence in brief tends to establish the following facts: Both appellants were subscribers for capital stock of the newly organized Fred Krug Brewing Company of Omaha, Neb. (hereinafter called the company). On July 13, 1933, the company, the Fred Krug Products Company, the Associated Distributors (hereinafter called distributors) of Minneapolis, Minn., and the Omaha National Bank entered into an agreement in writing providing for the sale of 175,000 shares of the capital stock of the company by the distributors. The purpose of the company was to rehabilitate and operate an old brewery at Omaha which had been owned and operated by the members of the Krug family prior to the adoption of the Eighteenth Amendment to the Constitution, but which had not been in use while that amendment was in force. Money was needed not only to rehabilitate the old plant, but also for working capital after the brewery was restored. It was recognized that unless sufficient capital could be made available for both of these purposes, it would be useless to raise any; and that it would be difficult if not impossible to sell stock to the public unless assurance could be given subscribers that all the stock would be sold and the necessary funds raised or their money returned. Besides, it was necessary to formulate a plan that would meet the approval of and enable the company to secure a permit from the proper officers of Minnesota and Nebraska to sell stock in those states. To accomplish these ends, the agreement provided that the distributors should sell 175,000 of the 215,000 authorized shares of the company within a period of 60 days at $1.50 a share for a commission of 10 cents a share to be paid only upon complete performance of the contract. It was further provided that the stock should be placed in escrow with the Omaha National Bank and that as subscriptions were received the subscriber's money should be held in escrow by the bank until the subscriptions for the total number of shares were complete; and that the bank should issue interim certificates to the subscribers. The interim certificates were to be taken up, and the subscribers' money returned at the close of the period in event of failure to sell the entire 175,000 shares before that date. If the full amount should be subscribed, then the stock was to be issued and delivered to the subscribers, and not otherwise, and the bank was to turn the money received for the stock over to the company. The time stipulation in this agreement was later extended for a period of thirty days, that is, to October 10, 1933.

Upon application of the distributors, the Commerce Commission of Minnesota registered the shares of stock on condition that "the escrow agreements as set forth in the application for registration, be strictly adhered to," namely: " * * * (b) That all the moneys derived from the sale of 175,000 * * * shares registered by this order shall be held in escrow by the Omaha National Bank until said 175,000 shares of stock shall have been sold and paid for."

Pursuant to the escrow agreement the stock specified was deposited with the National Bank and the sale of the same by the distributors was commenced. Early in September the distributors found itself with 60,000 shares unsold and became fearful that it might be unable to sell the same before the closing date. A previous attempt to borrow an amount necessary to terminate the escrow agreement having failed, negotiations were opened with the appellee United States National Bank, through Mr. Yates, its president. As an inducement to the appellee to make the loan, Drey, president of the distributors, offered to pledge all the unsold stock, together with other collateral. After extended negotiations with Yates and other officers of the bank,

it was decided that the appellee would loan the distributors $90,000 for a period of one day, provided that the 60,000 shares of unsold stock would be left with the defendant bank as collateral and also provided that the company would sign the note jointly with the distributors. Arrangements were made between the officers of the appellee, the company, and the distributors, to complete the escrow agreement with the Omaha National Bank, secure possession of all the stock in escrow, and to cause the transfer of the money received for the stock from the Omaha National Bank to the account of the company in the appellee bank.

On October 10, 1933, representatives of the company and the distributors, and Mr. Maxwell, appellee's attorney, met with Mr. Monen, trust officer of the Omaha National Bank, for the purpose of completing the escrow agreement by payment of the balance due on the remainder of the unsold shares. Monen was told that sufficient funds were on hand to satisfy the escrow agreement and on inquiry was assured by those present that the proceeds on hand came from the actual sale of stock and that there was no repurchase agreement. · Being so assured, Monen issued the remainder of the stock on receiving from Maxwell cashier's checks on the appellee bank totalling $90,000, which Maxwell had brought with him. In accordance with previous arrangement, the amount due the company from the Omaha National Bank, amounting to $217,000, was transferred to the appellee bank on October 11. On that date the company gave the appellee a check for $90,000 receiving therefor a so-called "counter-receipt." Interest in the amount of $15 for the day's loan was collected by the appellee. On October 13, the directors of the company authorized the purchase for its treasury of the 60,000 shares held by the appellee bank as collateral. By this circuitous arrangement, the escrow agreement designed to secure full subscription of the stock was successfully circumvented.

Simecek testified that he subscribed for 1,500 shares of stock on August 31, 1933, through Ingram, local manager for the distributors; that he received for that subscription interim certificates; that in September he subscribed for 4,000 additional shares; that he was not given interim certificates for the latter for the reason, he was told at the time, that it was too close to the end of the period for closing

out the entire issue. He received his shares of stock some time after October 24.

Bartelheim subscribed for 3,000 shares of stock on August 16, 1933, thereupon receiving an interim certificate which he exchanged for a permanent certificate following the closing of the escrow agreement. He also bought, on February 17, 1934, an additional 300 shares of stock at $1.44 per share. Both appellants testified that they bought the stock relying on the escrow agreement and believing that it would be carried out. Bartelheim also testified in regard to his second subscription that he relied upon and believed that the escrow agreement had been carried out.

The appellants some time in December, 1934, discovered the breach of the escrow agreement and thereupon tendered their stock back to the company and demanded the return of the purchase price, which demand was refused. Thereafter the company filed its petition under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). The appellants filed claims with the trustee, contending that the sums paid for the stock constituted trust funds in the possession of the company, and demanded the return of the money plus the legal rate of interest. In the reorganization proceedings a plan was approved by the court whereby the appellants recovered one-third of the money they had paid, in consideration of the release of the company from any further claims on account of the subscriptions, reserving, however, their causes of action against third persons.

At the close of the appellants' evidence the appellee moved for directed verdicts upon thirteen different grounds, one of which went to the question of jurisdiction and the other twelve to the essential ingredients of the causes of action. Acting on the rule that a federal court should dismiss a case at any time when lack of jurisdiction appears, McNutt v. General Motors Corporation, 298 U.S. 178, 184, 56 S.Ct. 780, 782, 80 L.Ed. 1135; Miller v. First Service Corporation (C.C.A.8) 84 F. (2d) 680, the lower court dismissed both cases without prejudice on the ground that the amount involved in each of them did not "exceed the sum or value of $3,000." 28 U.S.C. § 41 (28 U.S.C.A. § 41).

In the Simecek case the lower court held that there was no evidence that the money for the 4,000 shares ever came into the Omaha National Bank; that, as the

cause of action was based upon the escrow contract, there could be no breach of the contract if the money did not go into the Omaha National Bank, and therefore no liability on the part of the appellee bank could exist with reference to the 4,000 shares; and that the controversy between the parties could be with reference only to the money paid on the 1,500 shares which was considered insufficient to confer federal jurisdiction.

■ With respect to federal jurisdiction, the fact that the claim may ultimately be held bad is immaterial. The Fair v. Kohler Die Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716. Except where it appears that part of the claim is fictitious and inserted for the purpose of invoking jurisdiction of the court, Nathan v. Rock Springs Distilling Co. (C.C.A.6) 10 F.(2d) 268, the amount in controversy is determined by that actually claimed in the petition and not by the amount the plaintiff may ultimately recover. Barry v. Edmunds, 116 U.S. 550, 560, 6 S.Ct. 501, 29 L.Ed. 729.

■ The petitions in both cases ask judgment for damages suffered by the appellants on account of an unlawful conspiracy, of which the appellee bank through its officers was a party. Where conspiracy results in the commission of a wrong, the cause of action has always been considered to sound in tort, Young v. Main (C.C.A. 8) 72 F.(2d) 640; Green v. Davies, 182 N. Y. 499, 75 N.E. 536, 537, 3 Ann.Cas. 310; Morton v. Weet, 142 Misc. 473, 254 N.Y.S. 655, and not in contract, it being immaterial that the acts constituting the wrong may in some way affect a contractual relationship. Churchill v. Howe, 186 Mich. 107, 152 N.W. 989, 990; Van Oss v. Synon, 85 Wis. 661, 56 N.W. 190, 191. To what extent the escrow contract was breached is unnecessary to the decision, as the petitions allege overt acts in pursuance of a conspiracy resulting in consequent damage. Passing by the general rule that where the plaintiff has several demands against the defendant which he may join in one action, the aggregate of those demands, exclusive of interests and costs, is the amount in controversy, Kimel v. Missouri State Life Ins. Co. (C.C.A.10) 71 F.(2d) 921, 924; Baltimore & O. Southwestern R. R. Co. v. United States, 220 U.S. 94, 106, 31 S.Ct. 368, 55 L.Ed. 384; Provident Mutual Life Ins. Co. v. Parsons (C.C.A.4) 70 F.(2d) 863, 864, certiorari denied 293 U.S. 582, 55 S.Ct. 95, 79 L.Ed.

678; Bullard v. Cisco, 290 U.S. 179, 54 S. Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141, it should be noted that only one cause of action is in effect alleged by the plaintiff. The fact that the money held in escrow came from two different subscriptions is immaterial. Complaint is made of only one breach of duty.

The failure of the conspirators to procure interim certificates for Simecek for his 4,000-share subscription does not therefore affect the validity of his claim for damages as a matter of law nor demonstrate that his claim for such damages is fictitious for the purpose of determining federal jurisdiction. Prior to October 10, Simecek had paid for the 4,000 shares. On that date the Omaha National Bank was handed money sufficient to pay for the entire block of 175,000 shares, and the stock was released. The appellee insists that the fact that the permanent certificates for these 4,000 shares were dated November 8, shows that Simecek received his stock from some unknown third party subsequent to the closing of the escrow agreement. Such a conclusion does not necessarily follow. It may be well to note that the appellant Bartelheim admittedly received interim certificates long before October 11, and yet his permanent certificates are dated November 7. The fact that Drey first obtained the 4,000 shares in his own name before turning them over to Simecek, in no way affected Simecek's rights, if his money was obtained on the assurance that the escrow agreement would be completed in good faith or the money returned.

■■ In the case of Bartelheim the court eliminated any consideration of the claim for damages arising from the sale of February 17, 1934, and considered only the stock bought in August. As $1,500 had been returned on the purchase price of $4,500, the court concluded that a claim of only $3,000, and not exceeding that, existed exclusive of interest and costs. What has been said with reference to Simecek's case is applicable here; the fact that the two transactions arose at different times does not permit their separation in determining the jurisdictional amount. Moreover, the use of an interest calculation as an instrumentality in arriving at the amount of damages in a tort action for jurisdictional purposes has been approved in Brown v. Webster, 156 U.S. 328, 15 S.Ct. 377, 39 L.Ed. 440, and followed in Chesbrough v. Woodworth (C.C.A.6) 251 F. 881, 883;

Chesbrough v. Northern Trust Co., 252 U.S. 83, 40 S.Ct. 237, 64 L.Ed. 470. See, also, Intermela v. Perkins (C.C.A.9) 205 F. 603, 606.

The cases should not therefore have been dismissed for lack of federal jurisdiction as the sum demanded in each, in excess of the jurisdictional amount, was not purely fictional. If the appellants are entitled to recover at all, a possibility exists that the recovery may be less does not defeat jurisdiction. Wetmore v. Rymer, 169 U.S. 115, 128, 18 S.Ct. 293, 42 L.Ed. 682. The legal certainty of such a conclusion does not appear from the record. As the cases must be sent back for trial on the merits, any discussion as to the nature of the bank's liability for the acts of its officers within the rules laid down in Caldwell v. First Nat. Bank, 164 Minn. 401, 205 N.W. 282, 283; Greeley Nat. Bank v. Wolf (C.C.A.8) 4 F.(2d) 67, 69; Kostoff v. Meyer-Kiser Bank, 201 Ind. 396, 167 N. E. 527, 529, 168 N.E. 863, 69 A.L.R. 796; and St. Paul Cattle Loan Co. v. Housman, 48 S.D. 8, 201 N.W. 713, is unnecessary to their disposition. Both cases must be reversed and remanded for new trials, and it is so ordered.

Reversed.