Ira Y. Munn *et al.*, Appellants, *v.* I. H. Burch *et al.*, Appellees.

### APPEAL FROM COOK.

Such customs as are universally known to exist, enter into and form a part of every contract to which they are applicable, although not mentioned nor alluded to in the contract, and the courts will take judicial notice without proof, of a custom which is so universal and of such antiquity that all men must be presumed to know it.

Of this character, is the custom of banks to allow their depositors to withdraw their funds in parcels.

The check of a depositor upon his banker, delivered to another for value, transfers to that other the title to so much of the deposit as the check calls for, which may be again transferred to another by delivery, and the banker, when the check is presented to him, becomes liable to its owner, and must account to him for the sum called for therein, provided the drawer of the check has funds to that amount in the banker's hands subject to his check at the time it is presented.

The public are not bound to inquire into the special instructions which the officers or servants of a bank may have received, as to the manner in which their duties are to be performed.

This was a bill in chancery by appellants, against appellees,

25   35
30a  92
25   35
37a  218
25   35
137  643
25   35
40a  592
25   35
149  352
44a  411
25   35
50a  442
25   35
58a  385
25   35
60a  615
25   35
69a  683
70a  410
25   35
171  533
72a  317
25   35
181  283
85a  295
25   35
183  481
183  482
184  152
25   35
d186 4443
d186 4444

to compel payment of a check drawn by C. Wright on appellees' bank.

On the 5th September, 1857, complainants, who are grain merchants in Chicago, sold to one Bissell a quantity of wheat, to be paid for by C. Wright, who, on the same day, being Saturday, gave to complainants, in part payment, a check for $6,500 on the bank of Burch & Co., where he kept his bank account.

The same day complainants deposited this check with George Smith & Co., with whom they kept their account. On the next Monday morning, Smith & Co. sent this check to the bank of Burch & Co., about 10 o'clock, for payment.

After it came into Burch's bank, and while it was lying there, Wright came in with his bank book kept by Burch & Co. with him, and had some conversation with the clerks about the state of his accounts with the bank.

It then appeared, and this fact is everywhere admitted in the case, that C. Wright had, when he drew the check on Saturday, and also on Monday, when it came into Burch's bank, money enough on deposit to his credit to pay it, and more too.

Wright asked the clerks to tell him how his accounts stood, and the book-keeper took his bank book and entered in it, on the credit side, the $6,500 check, and one or two others. Wright then drew a check for $300 on Burch & Co., which they paid him there, as part of the money to his credit, after charging him with the $6,500 check.

This all occurred about 10 or 10½ o'clock, Monday, A. M.

Wright was acting as agent for S. J. Holly, of Oswego, N. Y., in buying grain at Chicago. The wheat bought of complainants was for him.

Wright had been in the habit of drawing bills on Holly, which Burch & Co. discounted, and placed the proceeds to his (Wright's) credit in their bank.

A draft for $9,000, drawn by him on Holly, which matured on the 2nd September, 1857, at Oswego, N. Y., had been protested for non-payment. This Burch & Co. knew, as Wright swears, on the 4th or 5th September, 1857, but it was not treated as a failure of Holly's. They only complained that he did not apply the proceeds of the grain shipped in payment of the bills drawn upon it.

On Saturday the house in New York City with which Holly was connected in business, failed, and on the same day a draft of Wright's on Holly for $6,000, which had been discounted by Burch & Co. for Wright, fell due in Oswego, and was protested for non-payment; and notice sent on the 7th September, 1857, to Burch & Co. and Wright, at Chicago. Holly failed or closed

on Saturday, but no news of it was received at Chicago until Monday, so far as the case shows.

Between 11 and 12 A. M., on Monday, Wright met Valantine, a partner of Burch & Co., on 'change, who told him Holly had failed, but he did not receive notice of the protest of his bills drawn on Holly until some days after that.

When Valantine learned of the failure of Holly, and after Wright had been at the bank, he directed the $6,500 check to be returned to George Smith & Co. unpaid, and he gave orders to their clerks to pay no more of Wright's checks. At what precise time this was done, the case does nót show ; but from all the evidence it would appear to have been about 11 o'clock A. M., or about an hour after Wright was in the bank. The clerks swear the entry in Wright's book of the $6,500 check was done without the authority of Burch & Co., or their knowledge, although it was made by the book-keeper, and the money given Wright was paid him by the paying teller in the ordinary course of his business.

Wright swears that he learned from Valantine, on 'change, of Holly's failure; that supposing the $6,500 had been paid, he gave Valantine a bill of lading for part of the cargo. (Burch & Co. had discounted nothing on account of that cargo.) Valantine did not tell him the check was refused payment ; and Wright swears he would not have given him the bill of lading for the wheat bought of complainant, had he known the check was unpaid.

Burch & Co. stopped the wheat *in transitu* at Detroit, sent it to Buffalo and sold it, receiving as net proceeds the sum of $5,680.90.

The check was returned to George Smith & Co., who demanded payment of it of complainants, who re-paid the amount to them, and brought this suit to compel Burch & Co. to pay the check to them.

The bill alleges, and the answer of Burch & Co. admits, that Wright kept his bank account with Burch & Co. according to the custom of bankers and their customers in such cases.

The court, MANIERRE, Judge, presiding, dismissed the bill, and entered a decree for defendants, from which the complainants appealed to this court.

C. BECKWITH, and SCAMMON, McCAGG & FULLER, for Appellants.

B. F. AYER, and HOYNE, MILLER & LEWIS, for Appellees.

CATON, C. J. But few questions have been presented to this

court of greater commercial importance than this, and although we propose to discuss it in very few words, it has been the subject of much anxious thought and examination, before a final determination has been arrived at. The question presented involves the inquiry as to the true relation existing between the banker, the depositor, and the public; or, in other words, any one who holds and presents the check of the depositor upon the banker.

The convenience of commerce upon this, as upon most other commercial subjects, has made its mark, and beaten its own track, and almost necessarily that track is the way which the convenience and the necessities of commerce have found the best, to promote the general good. When there is a certain well-beaten track upon any subject, which the commercial public habitually follows, which business men almost or quite universally pursue, without express promise or dictation, everybody has a right to assume that all similarly situated, or in the way of that road, will pursue it. That is what is called commercial custom or usage, and enters into and forms a part of every contract to which it is applicable. These are principles of the law merchant, which have been adopted and have become a part of the common law. Whenever the courts shall disregard and destroy these principles, they will have inflicted a serious wound upon commerce, but they cannot destroy these customs. Commerce cannot require anything which is unreasonable and unjust; but what experience shows that her convenience does require, that she will have, for it will be still adhered to by the common consent of the commercial world; and if the courts should refuse to enforce it with the few who refuse to conform to such a general custom, the moral sense of commercial men will apply its still more coercive influence, which few will withstand; and the deleterious influence which these few can exert will be very limited. But the courts will not and should not ignore these customs, long established, and well understood and acted upon in all contracts and transactions to which they apply. There is no principle of the law at this day better understood, and more universally acted upon, than that such customs and usages as are universally known to exist, enter into and form a part of every contract to which they apply, although not mentioned nor alluded to in the terms of the contract.

Some of these commercial customs the courts will take notice of as a matter of law, and others have to be proved as matters of fact. Where a custom is so universal and of such antiquity that all men must be presumed to know it, courts will not pretend to be more ignorant than the rest of mankind, but will recognize and act upon it. Such is the custom governing checks on bankers. The general rule is, that the creditor cannot divide

up his demand against the debtor and require the latter to pay it in parcels.   But every body knows, and courts no less than commercial men, that an exception to this rule exists as to deposits in bank.   It has been so long and so universal a custom with bankers to receive deposits from time to time, as the convenience of the depositor may require, and to allow him to draw out his funds on checks, in parcels, in such sums as he sees fit, that the mere fact of opening a deposit account with a banker implies a contract on the part of the banker, to allow the depositor to withdraw his deposits in parcels.   The books are full of cases where the courts have implied such a contract on the part of the banker, and for the purpose of raising such implication, have taken notice of such custom ; for it is only by force of such a custom that such a contract, which is against the general rule of law, can be implied.   We advance thus far in this case upon well trodden judicial ground, about which there is no dispute. But there is another bankers' custom, scarcely less ancient, not less universal, and as generally recognized and acted upon ; and that is, that the depositor may draw his check in favor of any third party, to whom, upon presentation, the banker pays the amount of the check, out of the funds in his hands belonging to the depositor.   Indeed it is comparatively a rare occurrence that the depositor presents his own check to the banker for payment.   In a vast majority of cases the check is presented by a third party, in whose favor it has been drawn, or to whom it has been passed in the regular course of business, in payment and satisfaction of some debt or demand.   In strictly commercial circles, an hundred times more debts are paid with checks than with coin or currency.   They are received, and passed and deposited with bankers as cash, subject of course to be made good if not paid on presentation.   When presented, these checks are paid as the property of the presenter and not of the depositor, and not as a matter of favor to him but as a matter of right. The custom of banks recognizes this mode of changing the title of money in their hands from one person to another.   There is no custom known among banks, or any other departments of finance or commerce, more universally recognized and acted upon than this.   If it is possible for any custom to create a right by, entering into and forming an implied part of the contract, this would seem to be that one, for its antiquity, its universality, and, above all, its convenience, nay, its absolute necessity to meet the wants of the vast commercial contracts of the present day.   To say that the holder of a bank check has not both a legal and an equitable right, after presentation of the check, to the money of the drawer in the hands of the banker, would destroy the most valuable feature of bank deposits and checks.

Without it, this whole system would become worthless and destroyed. Unless the depositor can be thus accommodated, it is worth no man's while to keep a deposit account with a bank. And no man will wish to be troubled with the check of the best drawer, if he acquires no right by its presentation, and is only to receive pay upon it as a matter of favor. But we are entirely satisfied that such is not and cannot be the law. Well recognized legal principles lead us inevitably to the same result, which commercial convenience requires. This universal custom shows us what the contract of all the parties is. It shows us that the banker, when he receives the deposit, agrees with the depositor to pay it out on the presentation of his checks, in such sums as those checks may call for, and to the person presenting them, and with the whole world he agrees that whoever shall become the owner of such check, shall, upon presentation, thereby become the owner, and entitled to receive the amount called for by the check, provided the drawer shall at that time have that amount on deposit. Who shall object to that portion of the contract which the law raises by implication on the part of the banker to the third person—to any body and to every body ? Surely every sound lawyer will at once perceive a privity of contract between the banker and the holder of the check, created by the implied promise held out to the world by the banker, on the one side, and the receiving of the check for value and presenting it, on the other. It is a familiar principle of daily illustration, that a promise made to the public that the performance of a particular act shall entitle the person performing the act to a particular right, is a valid assumpsit to such person. The promise on the one hand, and the performance on the other, creates a privity between the parties as intimate and as obligatory as if the promise had originally been made to the particular person.

We hold then, that the check of a depositor upon his banker, delivered to another for value, transfers to that other, the title to so much of the deposit as the check calls for, which may again be transfered to another by delivery, and when presented to the banker, he becomes the holder of the money to the use of the owner of the check, and is bound to account to him for that amount, provided the party drawing the check has funds to that amount on deposit, subject to his check at the time it is presented.

The facts of this case present another question requiring an observation.

The testimony shows, that on the morning of the 7th of September, when this check was presented for exchange or payment, by the bank of Geo. Smith & Co., there stood to the credit of the drawer of the check, in the defendant's bank, more than the amount of the check, and that the book-keeper of the bank,

Munn et al. *v.* Burch et al.

at the request of Wright, the drawer of the check, entered upon his pass book, to his debit, this check, with several others which had come in that morning, leaving still a balance to his credit of some four hundred dollars. These checks had not at that time passed through other hands and other books, which, according to the instructions of the book-keeper and the regulations of that bank were required, before he was authorized to pass them to the credit of the banks presenting them. After these checks were entered to the debit of Wright, on his pass book, by the book-keeper, Wright drew a check for three hundred dollars, which he presented himself, and which was paid the same morning. This act of the book-keeper, it is insisted, was not binding upon the defendants, because it was in violation of his instructions. We think the defendants were bound by that act, as much as if it had been done by them personally. The public are not bound to inquire into the special instructions which the officers or servants of a bank may have received, as to the manner in which they shall discharge their duties. That is a matter solely between the employer and the employed. By placing this book-keeper in that place, they accredited him to the public, and if he acted in violation of his instructions they must bear the responsibility, as if such instructions had not been given. But we think this act had but little influence on the case. We think here was an equitable, if not a legal, assignment and transfer of this fund, from the depositor to the holder of this check. At the time the check was presented for payment or exchange, the drawer had in the bank, subject to his draft, an amount sufficient to pay it. The rights of the parties were then fixed, and the defendants had no right subsequently to pay other checks or other demands, either to themselves or to others, which were afterwards presented or accrued, and then return the check dishonored. Although the custom of banks in Chicago may have allowed this bank to retain the check till noon, for the purpose of seeing whether the drawer had funds sufficient to meet it, yet they had no right to change the actual state of the accounts from what they were at the time the check was presented. At that time, there can be no doubt that the drawer had sufficient funds on deposit, and subject to his draft, to pay this check.

We are of opinion that the complainants were entitled to a decree for the amount of the check and interest.

The decree is reversed, and the suit remanded.

*Decree reversed.*