## Frederick A. Rauch et al., Appellants, v. The Bankers National Bank of Chicago, Appellee.

### Gen. No. 13,966.

1. INSTRUCTIONS—*when presentation too late.* An instruction presented in contravention of a rule of the Superior Court after the argument to the jury has begun, may properly be refused for that reason.

2. NEGOTIABLE INSTRUMENTS—*when bank liable to holder of check.* Prior to the act of June 5, 1907, a bank was only liable to the holder of a check if it had sufficient bankable funds to pay the same on deposit subject to the order of the drawer.

3. NEGOTIABLE INSTRUMENTS—*effect of payment on forged indorsement.* The payment of a check by the drawee bank on a forged indorsement, does not constitute nor prove the acceptance of the check by the bank so as to make it thereafter as an acceptor of the check, liable to the true owner.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed October 8, 1908.

SIMON P. GARY, for appellants; JOHN J. KANE, of counsel.

H. H. C. MILLER and W. S. OPPENHEIM, for appellee.

Mr. Justice Brown delivered the opinion of the court.

This is an appeal from a judgment by the Superior Court of *nil capiat* and for costs against the plaintiffs below (appellants here) in an action of assumpsit.

The suit was brought on six checks, in regard to each of which there were two special counts in the declaration.

The first of these counts in each case described the check as drawn by one Max Relitz on The Bankers National Bank (the defendant and appellee) and delivered by said Relitz to the plaintiffs, and then averred that on, to-wit: April 9, 1903, the plaintiffs presented the said check to the defendant, for payment thereof, and demanded payment thereof, and that at the time when said last mentioned check was so presented and payment demanded, the defendant had on general deposit in its hands sufficient moneys of the said Relitz subject to said check to pay it.

The second count in each case described the check in the same way, but then averred that after delivery of the same to the plaintiffs on to-wit, at some date (different from the others in each case), the defendant accepted the same. In each of the counts the conclusion is that by means of the matters alleged in it, the defendant became liable to pay the amount of the check described to the plaintiffs.

The following is a list of the checks thus declared on with the date of the alleged acceptance of each one (alleged under a *videlicet*):

| No. | Date. | | | Amount | Alleged Acceptance. | | |
|---|---|---|---|---|---|---|---|
| 154 | Dec. | 17, | 1901. | $213.56 | December | 19, | 1901. |
| 250 | June | 16, | 1902. | 71.00 | June | 20, | 1902. |
| 128 | July | 12, | 1902. | 128.00 | July | 14, | 1902. |
| 400 | Aug. | 11, | 1902. | 36.65 | August | 13, | 1902. |
| 405 | Sept. | 30, | 1902. | 70.00 | October | 2, | 1902. |
| 736 | March | 7, | 1903. | 80.00 | March | 10, | 1903. |

To these special counts the common money counts were added, including one for "money had and received for the use of the plaintiff."

The defendant pleaded the general issue of *non assumpsit*. The cause was submitted to a jury, who found for the defendant, and the judgment followed after a new trial had been denied.

There were no instructions given to the jury. Those offered by the plaintiffs, except a peremptory one to find the issues for the plaintiffs, were presented in contravention of a rule of the Superior Court after the argument to the jury, and were declared by the Court to come too late and to be refused for that reason. The peremptory instruction in favor of the plaintiffs was asked in time at the conclusion of the evidence, and denied.

The defendant also asked a peremptory instruction, which was refused.

The facts involved in the case, as claimed by the defendant, are that the plaintiffs, F. A. Rauch & Co., in 1901 and 1902, and the early part of 1903 (and for ten or twelve years before) had in their employ a salesman and collector named Bugenhagen. Bugenhagen was not authorized to indorse checks for the plaintiffs, but was expected to turn over to them any checks and all cash collected by him from their customers. He did not do so, however, but embezzled during the time of his employment a considerable sum of money— $1,500 seemed to be his own estimate and several thousands the plaintiffs'. Among the customers of F. A. Rauch & Co. was Max Relitz, who was a depositor with the defendant, The Bankers National Bank of Chicago. Bugenhagen collected from Relitz, for the plaintiffs, at various times between December, 1901, and March, 1903, and they gave him on or about the days before mentioned as their dates, the various checks sued on, running to the order of the plaintiffs. Bugenhagen, without authority, first indorsed them "F. A. Rauch & Co.," then added the indorsement of

his own name, and sold and transferred them to various parties, who again transferred them by deposit in various banks or otherwise, and they were all finally paid by The Bankers National Bank, on which they were drawn, to the various banks presenting them.

Out of the $599.21 which the checks aggregated, Bugenhagen turned over to the plaintiffs, on account of Relitz's indebtedness to them, $344.95, for which Relitz was given credit by them. The rest he embezzled. The plaintiffs discovered in March, 1903, that Bugenhagen had been embezzling from them, and his manner of doing it. They proceeded to check up their accounts with their customers from whom Bugenhagen had been collecting, in order to ascertain the amount of money he had misappropriated, and these customers turned over to them various checks which had been given to Bugenhagen, and which had been returned to them by their respective banks. Among them were the checks of Relitz which have been sued on, and another of $10, and with these checks, or some of them, and others, the plaintiffs confronted Bugenhagen in their private office on March 17, 1903. The embezzlement was confessed by Bugenhagen, and the amount of it on the Relitz account determined to be $254.26, for which Relitz was given an additional credit by Rauch & Co. That is, all other money which Relitz had paid in checks had evidently been reported and turned over as cash to Rauch & Co. and credited by them to Relitz on his account. It was only this amount of $254.26 of the payments by him for which he had not up to that time received credit on Rauch & Co.'s books, and when it was thus discovered that he had actually paid that amount more than he had been given credit for, a credit entry was made in his account, under date of March 23, 1903—"W. B. $254.26"—indicating that although Relitz was entitled to an additional credit of that amount, Bugenhagen had embezzled it. It does not appear how the $254.26 was made

up. There are, however, four of the seven checks which together make $254.65.

On the evening of March 18th there was another meeting between Bugenhagen and Rauch and his partner, Lamping, at Gore's hotel. At that time an agreement was presented to Bugenhagen, reciting his shortage and containing an undertaking on his part to pay F. A. Rauch & Co. $700 in two years, $700 in three years, $800 in four years, and to turn over a mortgage of $800 held by his wife, to make up the sum of $3,000, at which sum a settlement for the shortage had been arranged. Bugenhagen did not have the mortgage with him, and agreed to bring it the following day, but signed and delivered the agreement and notes evidencing the payments described in it.

Bugenhagen did not, however, keep his promise to bring the mortgage on the 19th, and Rauch & Co. sent for him. He went to see them on March 26th, told them he had taken the matter up with his wife and was going to bring the mortgage later. They said it was too late and destroyed the notes in his presence but retained the agreement.

The plaintiffs' counsel question this statement of facts in some particulars. They say that it does not appear from the evidence that any of the money derived from the Relitz checks was turned over to F. A. Rauch & Co. But there was evidence which certainly justified the jury in drawing this inference, and if it were material we should have to hold that it inhered in their verdict that they did so find. The suggestion that Bugenhagen may have taken goods from appellants' store and sold them to third parties and turned in some of the cash on Relitz's account may be true, but there is no evidence to support it.

Counsel also claim that the notes and agreement were presented and signed and the notes torn up at the same meeting of Bugenhagen and the plaintiffs, not at meetings several days apart. The plaintiff Rauch testified that it was at the same meeting that

630    APPELLATE COURTS OF ILLINOIS.

Rauch v. The Bankers National Bank of Chicago, 143 App. 625.

the notes were signed that they were destroyed, but the
testimony of Bugenhagen was explicit that it was on
March 18th that the notes and agreement were signed,
and on March 21st that the notes were destroyed. The
"second interview," to which the plaintiffs' counsel
refer in their reply brief, plainly and indeed expressly
refers to the "second" interview in regard to the
notes, taking place, as the witness had just stated, on
March 21st. He said that he had a memorandum of
the dates. The jury had the same right and, as we
think, taking all the evidence together, as good reason
to believe him as the witness Rauch, and we must as-
sume that they did so if such belief was essential to
their verdict.

But our decision of this case is based on other
grounds, to which these matters are immaterial and
which involve the following facts: On April 9, 1903,
Henry W. Prouty, an attorney at law representing F.
A. Rauch & Co., took the seven checks of Relitz which
had been given him by Rauch & Co., to The Bankers
National Bank and interviewed Mr. Judson, the as-
sistant cashier, in regard to them. Mr. Prouty testi-
fied that he "stated to Mr. Judson the claim of Rauch
& Co. with respect to the forgery of their indorsement
on them, and I inquired of him what evidence he de-
sired presented to the bank in order that it should pay
the checks, and he asked me to have an affidavit made
by my clients and attached to these checks, stating
that the indorsement of their firm name on the checks
was a forgery and placed there without their authority,
and just briefly identifying the checks and the indorse-
ment, and attach them and then hand them" (the
checks) "with the affidavits attached, to him. I asked
him if he wanted to have the checks indorsed by
Rauch & Co., and he said not."

Mr. Judson's account of the conversation was slightly
different. He testified that when Mr. Prouty showed
him the checks and claimed that the indorsement was
not genuine, he told Mr. Prouty that they had paid

them once and charged them to the account of the drawer; that he had not heard of any claim being made by the drawer and that he could not recognize any claim by the payee; that he then said that it was customary, where an indorsement was claimed to be forged, for the payee to set that forth in an affidavit and have that affidavit attached to the check. * * *
"I said that before I could take that up with the banks to whom we had paid the money, I should have to have it in the proper and usual form. That usual form was an affidavit by the payee setting forth that the indorsement as it appeared on the checks was not genuine."

"Q. What, if anything, was said by you to Mr. Prouty about waiving the signature of F. A. Rauch on these checks, if you paid them? A. Oh, we would not waive it, no.

Q. Did you say anything of that kind? A. No.

Q. Did you say to Mr. Prouty you would pay these checks without requiring the signature of F. A. Rauch & Co. on them? A. Certainly not."

The checks were left by Mr. Prouty with Mr. Judson, who gave to Mr. Prouty a receipt for them, which the record shows was offered in evidence and marked Plaintiff's Exhibit 7, but which for some unexplained reason was omitted from the transcript.

April 29th the check for $10 was paid by the defendant to Mr. Prouty, the amount of that instrument having been collected from the bank from which the defendant had received it, but the others were returned to Mr. Prouty with a refusal on the part of the defendant to pay them.

It is to be noted that the essential difference between the two accounts of what was said when Mr. Prouty presented the checks to Mr. Judson, is the direct contradiction of Mr. Prouty by Mr. Judson concerning the waiver of F. A. Rauch & Co.'s indorsement on them. If it required the belief of the jury, in order to justify their verdict, that Mr. Judson's

statement in this particular was the correct one, and Mr. Prouty's mistake, we should be obliged to hold it was within their right and province to decide between the contradictory statements—a matter which it will be seen is important when the position of the defendant is considered. That position is that the plaintiffs did not by their evidence establish any liability on these checks on the part of the defendant bank to anybody, certainly not to the payee; and also that even if the bank would have been liable on them to F. A. Rauch & Co. on April 9th and later, had they been presented for payment with the genuine indorsement of F. A. Rauch & Co. upon them, no such liability accrued without that indorsement on the presentation of them by an attorney at law of Rauch & Co. without written authority. Further, it is insisted by the defendant that under the circumstances which the jury were at liberty to find existed, of a settlement between Rauch & Co. and Bugenhagen concerning the Relitz account, which after three days was repudiated by Rauch & Co. by the destruction of the notes given in pursuance thereof, ratification of the indorsements on the checks by Bugenhagen of F. A. Rauch & Co.'s name and their collection by him might be properly presumed.

We do not think it necessary to discuss this last position. As to the question of Rauch & Co.'s genuine indorsement on the checks being essential before any legal obligation accrued which made the present suit, begun on April 27, 1903, sustainable by them, it must be said that it seems to us at least doubtful whether such indorsement was not necessary.

Had the checks been presented by Mr. Rauch or by Mr. Lamping, his partner, or if Mr. Prouty had shown written authority or otherwise affirmatively proven authority to collect the checks for them, the question would have been different. His being an attorney at law did not affect his right to demand payment. How did his representation that he was authorized by Rauch & Co. to demand and receive payment of the checks differ in

essence, so far as the bank was concerned, from Bu-
genhagen's representation that *he* was authorized to
negotiate them? In the one case the representation
was express and was true; in the other it was implied
and was false. But how was the bank legally to know
this?

The question is not whether had the checks been
paid to Mr. Prouty, the payment would have been
valid—which is the proposition discussed in Shaffner
v. Edgerton, 13 Ill. App. 132; but whether a legal lia-
bility to pay them to him was imposed on the bank by
his presentation of them on April 9, 1903.

But even if we consider that the genuine indorse-
ment of Rauch & Co. was waived by the neglect to ask
for it, or that the bank was bound to ascertain the
truth or falsity of Mr. Prouty's representation that
he was Rauch & Co.'s authorized agent before refus-
ing to pay the checks for lack of their indorsement,
we should be obliged to hold that no case was made
out against the defendant in favor of the plaintiffs
by this record. In our opinion a peremptory instruc-
tion in favor of the defendant would have been justi-
fied, and the verdict of the jury was justified by the
failure of the plaintiffs to prove an absolutely essen-
tial part of their alleged case.

This action is by the payee of these checks, which
are in the purview of the law, inland bills of exchange
against the drawee thereof.

By the law of Illinois as it exists today (since the
passage of the Negotiable Instruments Act of June
5, 1907), a bank is not liable in any case to the holder of
a check drawn on it "unless and until it accepts or cer-
tifies" the same. This conforms to the law as it be-
fore existed in most jurisdictions but in Illinois before
the passage of the act in question, and consequently
when the transaction involved in this suit took place
and when this suit was brought, a different doctrine
prevailed.

As laid down in a long series of cases, beginning

with Munn et al. v. Burch et al., 25 Ill. 35, a banker, when a check was presented to him and payment demanded, became liable to the legal holder of it, provided he had sufficient bankable funds to pay it on deposit belonging to the drawer and held out to be subject to his order by check. The reason for this rule is apparent and is given very clearly in the opinion of the court in Fourth National Bank v. City National Bank, 68 Ill. 398. It is because, by the nature of his business, the banker has promised to accept the inland bill of exchange in the form of a check before it is drawn. Such a promise to accept a bill of exchange, even though not in writing, was good in Illinois before the passage of the Negotiable Instrument Act, and tantamount to an acceptance after the bill was drawn so far as the liability of the drawee was concerned. That promise was held to be implied by the relations between the banker and the depositor. Says the Supreme Court in Fourth National Bank v. City National Bank, *supra:* ''The universal custom informs us what the contract of all the parties to such transaction is.

''It informs us that the banker when he receives the deposit agrees with the depositor to pay it out on the presentation of his checks in such sums as those checks may specify, and to the person presenting them and with the whole world the banker agrees that whoever shall become the owner of such check shall upon presentation thereof become the owner and entitled to receive the amount specified in the check, *provided the drawer shall at the time have that amount on deposit.*''

It is manifest that under this theory, unless there has been a special acceptance of a check, the allegation and proof that the drawer of it had at the time of the presentation of it to the drawee bank sufficient funds on deposit subject to it, are necessary to justify any judgment on it against the drawee in favor of the holder.

This was recognized by the plaintiffs herein, for six of the special counts of their declaration—one on each

check—contain the allegation "that at the time when said check was so presented to the defendant for payment thereof, and payment thereof was demanded from the defendant by the plaintiffs as aforesaid, the defendant had on general deposit in its hands sufficient moneys of the said Max Relitz, subject to said check, with which to pay the said check."

But the plaintiffs failed to make proof of this alleged fact. The payment of the check on forged or unauthorized indorsements was proven, and it may be assumed that the plaintiffs are right in their claim that these payments were of no effect whatever on the deposit of Relitz with the Bankers National Bank. But that does not prove that when the checks were presented for payment on April 9, 1903, by Mr. Prouty (which, as the appellants claim, was the first time they were presented by any one having authority to do it), Relitz had sufficient funds on deposit to pay them. Although the case was re-opened after the plaintiffs first rested, this proof was not offered, nor any proof even that when the checks were paid on the forged indorsements there was such sufficient money on deposit.

The nearest approach to it was the following colloquy between the court and the witness Relitz:

"The Court: *At the time you gave these checks* you had funds in the bank to meet these checks?

The Witness: Yes, sir.

Q. And from that account that was given you by the bank, you found these amounts deducted out of the amount of your deposit? A. From my deposits, yes, sir."

This does not meet the issue. Relitz may have had sufficient money when the checks were *given,* and yet have largely overdrawn his account before they were presented even with the forged indorsements, and certainly before the date (April 9, 1903), more than fifteen months after the date of the first and largest one,

when Mr. Prouty made the authorized presentation of them. It is within the common knowledge of all that banks frequently allow overdrafts, but that a check, because of such indulgence, would probably be paid if presented, makes on it no liability to the payee by the bank. That depends, as we have shown, entirely on the presence of funds when the check is presented.

The plaintiffs insist, however, that if the allegations of the 1st, 3rd, 5th, 9th and 11th counts as to such presence of funds were not proven (which indeed seems impliedly to be conceded), their case was made out under the 2nd, 4th, 6th, 8th, 10th and 12th counts, which declare on an acceptance of the respective checks, and under the *indebitatus assumpsit* count for money had and received. No action, however, on these checks against the bank accrued to the payee by the mere drawing of them. The bank could only become liable to the payee by an acceptance either implied under the former Illinois rule before stated, which required the presence of bankable funds when they were properly presented, or by an acceptance expressly made by certification or otherwise. The plaintiffs say that this acceptance was made by the very unauthorized payments of which they complain. This suggestion does not seem forceful to us. It is the contention which was made before the Supreme Court of the United States in First National Bank v. Whitman, 94 U. S. 343, and repudiated by that court. The language of the opinion in that case is so apt in the present case that we quote it:

"It is further contended that such an acceptance of a check as creates a privity between the payee and the bank is established by the payment of the amount of this check in the manner described. This argument is based upon the erroneous assumption that the bank has paid this check. If this were true, it would have discharged all of its duty, and there would be an end to the claim against it. The bank supposed that it

Rauch v. The Bankers National Bank of Chicago, 143 App. 625.

had paid the check, but this was an error. The money it paid was upon a pretended and not a real indorsement of the name of the payee. * * * We cannot recognize the argument that payment of the amount of the check or sight draft under such circumstances amounts to an acceptance creating a privity of contract with the real owner.

"It is difficult to construe a payment as an acceptance under any circumstances. * * * A banker or individual may be ready to make actual payment of a check or draft when presented, while unwilling to make a promise to pay at a future time. Many, on the other hand, are more ready to promise to pay than to meet the promise when required. The difference between the transactions is essential and inherent."

We do not see that the force of this reasoning as applied to the case at bar is at all weakened by the fact which the plaintiffs point out, that the doctrine of the Federal Courts differed from that of the Illinois Courts as to the rights of a holder of a check presented and refused when the bank had funds to meet it.

Our conclusion, as we have before indicated, is that the verdict of the jury was justified, and that a peremptory instruction for the defendant would not have been erroneous.

The judgment of the Superior Court is affirmed.

*Affirmed.*

Mr. Justice ADAMS: The only doubt which I have in the matter is whether the bank, having paid the checks wrongfully, should not be presumed, as between it and the appellants, to have had the money when the checks were presented by appellants' agent.