COMMONWEALTH BONDING & CASUAL-
TY INS. CO. et al. v. BOMAR. (No. 627.)

(Court of Civil Appeals of . Texas. Amarillo.
May 30, 1914. Rehearing Denied
Oct. 10, 1914.)

1. CORPORATIONS (§ 80*)—STOCK SUBSCRIP-
TION—FRAUD.
Where, in a suit to set aside a subscrip-
tion to the stock of a bonding and casualty in-
surance company for fraud, plaintiff alleged
that the officers and agents of the corpora-
tion to induce him to subscribe, falsely repre-
sented that $200,000 of the corporation's cap-
ital stock had been paid in in cash, and that
the corporation had made arrangements to
obtain all the money it wanted at 5 per cent.,
and would lend plaintiff as much as he might
desire, provided he furnished good security,
while in fact not more than $20,000 had been
received in cash by the corporation for such
stock, such allegation sufficiently showed that
plaintiff was . damaged by the false representa-
tions made to induce him to subscribe, and
this regardless of the fact that the representa-
tion that it would lend plaintiff money would
not of itself ·have been actionable.
[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec.
Dig. § 80.*]

2. CORPORATIONS (§ 80*)—STOCK SUBSCRIP-
TION—FRAUD.
Where plaintiff was induced to subscribe
for stock in an insurance company on a mis-
representation that it then had $200,000 cap-
ital stock actually paid in in cash, the injury
to plaintiff growing out of his signature by
reason of the fact that the corporation in fact
had only $20,000 capital stock paid in was
suffered at the time of the subscription; and
hence it would not be presumed against plaintiff
that defendant had remedied the injury, so as
to render plaintiff's petition for rescission fa-
tally defective because it did not charge that
the whole amount of the stock had never been
actually paid for.
[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec.
Dig. § 80.*]

3. EVIDENCE (§ 434*) — PAROL EVIDENCE —
WRITTEN CONTRACT—VARIANCE—FRAUD.
Where a stock subscription contract recited
that no conditions, representations, or agree-
ments other than those printed therein should
be binding on the corporation, parol ·evidence
that the contract had been obtained from plain-
tiff on false representations as to the amount
of the corporation's capital stock that had been
actually paid in was admissible to show that the
contract, by reason of the fraud, never in fact
came into existence and was not objectionable
as varying the terms of the written subscrip-
tion.
[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 2005–2020; Dec. Dig. § 434*]

4. INDEMNITY (§ 13*)—CORPORATIONS—FRAUD
OF AGENT—RATIFICATION—AGENT'S LIABIL-
ITY.
Where an agent of a corporation, who was
also one of its officers, induced plaintiff to sub-
scribe to the corporation's stock by fraudulent
representations, and such agent was in con-
stant communication with the other officers of
the corporation, and after plaintiff's subscrip-
tion had been secured the corporation, with
knowledge of the fraud, refused to rescind and
place plaintiff in statu quo, but retained plain-
tiff's money and notes given for the subscrip-
tion, it thereby became an active participant in
the fraud; and hence, on plaintiff being per-

mitted to recover against it, was not entitled to
recover over against the agent.
[Ed. Note.—For other cases, see Indemnity,
Cent. Dig. §§ 29–35; Dec. Dig. § 13.*]

Appeal from District Court, Baylor Coun-
ty; Jo. A. P. Dickson, Judge.

Suit by E. P. Bomar against the Common-
wealth Bonding & Casualty Insurance Com-
pany and others. Judgment for complainant,
and defendants appeal. Reversed and ren-
dered in part, and affirmed in part.

F. H. Haddix, of Ft. Worth, for appellant
Commonwealth Bonding & Casualty Ins. Co.
McLean, Scott, McLean & Bradley, of Ft.
Worth, for appellant Stuart. C. D. Russell,
of Plainview, J. A. Stephens, of Benjamin,
and Carrigan, Montgomery & Britain, of
Wichita Falls, for appellee.

HENDRICKS, J. This suit was instituted
by the appellee, Bomar, to recover $1,500,
paid upon a subscription contract of $4,000,
to $1,000 of the capital stock of the Common-
wealth Bonding & Casualty Insurance Com-
pany (designated herein as the Bonding Com-
pany), and for the cancellation of five
notes of $500 each, executed as a partial
consideration for said stock. The appellee
alleged that certain agents, who were officers
of said corporation, in soliciting the sub-
scription .to said stock, falsely represented
to him that the corporation, at that time,
had received the sum of $200,000 in cash, in
payment of stock, and also alleged that said
corporation had made arrangements to ob-
tain all the money it wanted at 5 per cent.,
and would lend to him (appellee) as much as
he might desire, provided he furnished good
security therefor; appellee making other al-
legations of fraud inappropriate, we think,
to this discussion, further presenting, how-
ever, that said representations induced him
to subscribe to the stock, and that but for
such representations he would not have en-
tered into the contract. Upon trial before
the court, judgment was rendered against
the bonding company for the $1,500 paid up-
on the stock and for the cancellation of the
notes and the subscription contract.

Appellant bonding company pleaded the
written subscription contract, and especially
the following clause, contained in the same,
as a bar to the alleged fraud:

"No conditions, representations or agreements
other than those printed herein, shall be binding
on the Commonwealth Organization Company
or the Commonwealth Bonding & Casualty In-
surance Company."

The bonding company assigns fundamental
error that the judgment of the trial court
was erroneous in granting the relief to the
appellee "on the petition which sought re-
covery * * * that the subscription con-
tract was obtained through fraudulent rep-
resentations and agreements not intended to
be performed, but which failed to show that

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

the petitioner had sustained any pecuniary or actionable injury. * * *"

[1] In addition to the allegation that the officers of said corporation, as agents, falsely represented that $200,000 of said capital stock had been paid in cash for the sale of said stock, appellee further alleged that "in fact not more than $20,000 had been received in cash by said corporation for said stock," which allegation would have been, as against a general demurrer, and in this instance, without the presentation of any demurrer, sufficient to show damage or injury, conceding that some damage or injury is necessary to be shown, in accordance with the rule enunciated in Bremond v. McLean, 45 Tex. 17, and in the main, as to the principle, followed by the Supreme Court in the case of Moore v. Cross, 87 Tex. 558, 29 S. W. 1051. In the Bremond-McLean Case, Justice Moore said:

"It does not appear from the petition that plaintiff suffered any injury from the alleged false and fraudulent representations as to the character of the note transferred to him, or that the note would or could possibly have been of any greater value to him than it was if appellant's representations respecting it had been true."

However, it is reasonably deducible in this cause that stock, if $200,000 in cash had been paid to and had become the assets of a corporation, would have been more valuable than the same stock in the same corporation, where not more than $20,000 in cash had been paid to said corporation upon subscription contracts for the purchase of said stock, and that any business man would so regard it. Necessarily the assets of a corporation, consisting of paid subscriptions to its capital stock, and without which it is unable to transact its business, lends substance to the corporation, and would likewise affect the marketability of the stock in proportion to the amount of such assets. This contract of subscription as pleaded (and as shown by the testimony) is partially executory, was repudiated by the subscriber, and the record is without any estoppel brought forward in the brief, or exhibited by the evidence.

In reading numerous authorities, affirmative and negative, in favor of and against the proposition that damage or injury must be shown in matters of false representation as an inducement to the contract, where an executory contract is attempted to be rescinded, we do not find any cause deciding the question, or which refers to any case which does decide, that a difference in value of the thing contracted for, and that represented, must be shown in accordance with the dollar mark; that is, that a measure of such damage or injury is required as a prerequisite to such right of rescission. The case of Moore v. Cross, supra, invoked by appellant, was decided by the Supreme Court squarely upon the evidence, and was one involving an executed contract, and was a cause, in reality, primarily sounding in dam-

ages for a difference in value, though rescission was also prayed for, and granted by the trial court and Court of Civil Appeals. The evidence showed in that cause that Cross received in estimated value what he traded for, and parted with, in estimated value, the property he conveyed, and without any claim that the property received was less than such estimated value, and that the property conveyed in exchange was any greater than such value—Cross did not agree to pay more than the property he received was worth, nor did he part with his property for less than it was worth. In regard to the representation in that cause by Moore that certain railway shops and depot yards would be constructed contiguous to the property he traded to Cross, it was not shown that the latter would derive any pecuniary benefit from their construction, and while Justice Brown does not so remark, it was not a legitimate inference, from the evidence in that cause, that the value of the property would have been increased by the construction of such improvements. In this case it is a legitimate inference that the stock contracted for by appellee would have been more valuable if the assets of the corporation, as alleged, would have been as represented.

On this question we adopt the following portion only of the opinion of Circuit Judge Wallace, in the cause of Stern v. Kirby Lumber Co. (C. C.) 134 Fed. 510, appropriate to the status here:

"Doubtless a court of equity would not grant relief in a case of purely inconsequential fraud, but the present bill does not present such a case. The reasonable deduction from the allegations of the bill is that the plaintiff's stock would have been of greater intrinsic value if the assets of the corporation had been such as they were represented to be."

The amount of capital stock paid in is quite indefinite from the testimony, though the president and treasurer of the bonding company and the officers of an organization corporation, promoting said bonding company, testified in the cause; however, the maximum amount deduced from the record is so subordinate in comparison with the amount represented to have been paid in as to sustain, in the main, appellee's contention upon this point; the assets really consisted of some secured and unsecured subscriptions to the capital stock which were never "whipped" into condition, in so far as the record shows, in order to do business.

It may be true that the promise pleaded, to the effect that the company would, within six months, lend the appellee the money he needed upon good security is too indefinite, though improperly made, to predicate an action for rescission. Moore v. Cross, supra. However, we are not prepared to say that the statement, alleged and testified to, that the officers of the corporation had made arrangements for money at 5 per cent. should be eliminated as an element of fraud.

Appellant confounds the issue when he

says that the sole consideration moving Bomar was the promise of a loan of money; it may be that if Bomar knew he could not have obtained money—with reference to which it is practically admitted in this record that it was represented to him that he would obtain it—he would not have subscribed for the stock, but that does not argue that, if he had detected the falsity of the representation that the $200,000 had been paid in, when it was so stated, he would have subscribed to said stock. It would be more correct to say that Bomar's expectation of obtaining the money was a moving consideration to him in his subscription to the stock.

Appellee says he relied upon each and all of the statements. The statement that $200,000 of the capital stock had been paid in cash was material in every way; in civilization, cash has a significant ring in all transactions. Though Bomar may have relied upon the promise, for the purpose of realizing his expectation in obtaining money, made by the officer of the corporation, he also had a right to rely upon the statement made by the same officer that $200,000 had been paid to the corporation, and that it was a material ingredient to him, as evidence that the promise would be fulfilled, that the company had advanced to that stage in its corporate development as to secure what he wanted. Because he relied upon the promise to lend him the money, which the law may say he did not have a right to rely upon as an element for the rescission of the contract, it does not argue that Bomar did not rely upon a material representation, which would, with thinking beings, give color and strength to the promise made. Neither can it be said that, if the bare promise only had been made, Bomar would have subscribed to the stock. As the Court of Appeals of New York said (it is true not in a case of blended statements) quoting from an English case:

"We cannot assume, from what was done in ignorance of the misrepresentation, what would have been done if the misrepresentation had been detected." Harlow v. La Brum, 151 N. Y. 278, 45 N. E. 860.

We believe it is sufficient to say that if a material misrepresentation is shown to have been relied upon, though blended with other statements which may have partially actuated another's conduct, it is not a defense to then indulge in psychology—to split hairs and attempt a metaphysical division—in order to escape the fraud. At least the question is: Was the statement material? If it were used, though along with other statements, to control Bomar's will and influence his assent, and concurred to that end, it is fraud.

"It may be asserted that any false statement by an authorized agent of a corporation, in regard to the condition of the corporation, or material matters connected therewith, by reason of which subscriptions to the capital stock are obtained, is regarded as a fraudulent representation." Thompson on Corporations, vol. 1, § 715.

If the statement was made as represented, the fact that it was not one literally that $200,000 had been paid "in cash," still, as made, it argues an intention to deceive, as it is clearly a statement implying that cash had been paid.

[2] The appellant suggests an additional reason why the petition failed to exhibit a cause of action; that "it was not charged that the whole amount of the stock had never been actually paid for"—the logic being that the appellee and not appellant was burdened with the statement and proof of such a matter. It is noted that appellant did not present or urge any exception whatever; we are, however, not denying that a petition bad upon general demurrer is not fundamental error, but if our premise is correct that it is deducible from the pleadings that damage or injury is shown at the time appellee was induced to subscribe for stock in a corporation which did not at that time have the assets as represented, we think it is not to be presumed against appellee that appellant had remedied the injury. The fraud was a consummated fact at that time, and the injury was existent at that time as a result of the act. Appellant may say: But did it exist when you filed the bill, or when the cause was tried? The appellant is silent as to any pleading upon this point, and does not show that it remedied the wrong perpetrated as alleged, and the evidence and the record, in sounding it, show to the contrary.

[3] The appellant bonding company, objected to the introduction of the testimony delivered by several witnesses, discussed in this opinion, upon the ground that the same tended to vary the terms of the written contract, and that the contract showed upon its face that it contained all the agreements between the parties, and upon the further ground that said contract provided, as set out previously in this opinion, that no representations or agreements, or conditions, other than those printed in the original contract, should be binding upon the bonding company.

The case of U. S. Gypsum Co. v. Shields, 106 S. W. 726, involved a contract containing the following stipulation:

"It is agreed that this written order and printed terms hereon constitute the entire contract between the parties, and there are no verbal statements or agreements varying the same."

Justice Neill, in that cause, said:

"If a party were denied the right to show facts which prevent a writing from constituting a contract, such a writing would be free from all defenses, and outside of all rules which determine the validity of contracts. * * * The evidence objected to was not introduced for the purpose of varying the terms of the writing sued upon, which it did not tend to do, but to the end of showing that defendant was induced to sign the paper by the fraudulent representations of the plaintiff."

There are numerous authorities to the effect that if a fraud induces a contract with

reference to the inception of the same, even though the fraud varies the terms of the instrument, it is admissible to prove that no contract ever existed. The Shields Case was affirmed by the Supreme Court, 101 Tex. 473, 108 S. W. 1165. However, the specific point was not commented upon. This court is acting upon the presumption that the question was raised in that case, and that our higher tribunal has affirmed the doctrine announced by the Court of Civil Appeals. We can see no difference in the principle between the Gypsum Case and the record here as to the particular question, and believe the analogy to be complete.

In the proceeding in the trial court, R. T. Stuart, who was the dominant spirit of an organization company, constituting a partnership in the promotion of the bonding company, was made a party by the appellee, Bomar, but recovery against Stuart by the former was abandoned. The bonding company, however, obtained a judgment for $500 over and against Stuart, in the event it had to pay the Bomar judgment, this sum representing the first installment paid by Bomar upon his subscription contract.

The contract between the bonding company and the organization company entitled the organization company to 12½ per cent. of subscriptions, for promotion expenses. The agent, who was the immediate cause of the successful solicitation of Bomar's subscription contract, was a vice president and director, a member of the executive and finance committees of said bonding company, and was also the treasurer of the same; and when he obtained the first installment on Bomar's contract of $4,000, he paid $100 of the same to Stuart, or the organization company, retaining $400 for himself, testifying as a conclusion that as to that transaction he was the agent of Stuart or the organization company, and that his agency of the bonding company as to Bomar's subscription was not that of a direct agency of such bonding company, but only through the subagency route.

[4] We are not advised upon what particular ground the trial court made Stuart liable to the bonding company, but we presume it was upon the doctrine of the agent's wrong to the principal, on account of which the principal could recover against the agent. We are rather prone to the conclusion, under the peculiar facts of this case, that this officer's agency of the organization company and the bonding company was a direct dual agency of both parties, directly representing the same, and he was not the agent of the bonding company solely through the channel of the organization company. The other officers of the bonding company, as well as Stuart, instigated the treasurer to solicit subscriptions, and, while doing so, he was in constant and daily communication with Mills, the secretary of the bonding company. He testified that he used his position in the bonding company as influentially as he could, for the purpose of obtaining subscriptions, and to show subscribers that he knew what the business of the company was going to be, and that he would be in a position to take care of his friends and see that they got their part of the money which was to be loaned by said company. He further testified that all the officers knew about him selling this stock, and they desired him to sell it. As an officer of the company he had assisted, and it was his duty, to some extent, to assist, in passing upon other contracts, written by other agents. He was drawing $250 per month, and it seems that his salary for the month of April, when this contract with Bomar was written, was obtained from the company only after a "squabble"; the latter contending that he should be satisfied with his commissions.

Again, the trial court found:

"That the defendant corporation, after it was fully informed of the fraud by which said money and notes were obtained, refused to restore said notes, and refused to repay the plaintiff the amount of money which it had received."

Aside from the question of joint agency, of this particular representative, we know that a principal's responsibility to others for the improper acts of an agent, in obtaining beneficial contracts or property, from third persons, is based upon the proposition that, having placed his agent in a position where he may perpetrate a fraud upon innocent third parties, he is unable to retain the fruits of the same and defeat the claim of third parties, and cannot justify the ends obtained by the agent, without repudiating the means used by him, though the principal may be innocent of any act of fraud. The Supreme Court of Indiana said as to transactions of this character (Wolfe v. Pugh, 101 Ind. 293):

"This the principal may generally avoid [the improper actions of the agent], by submitting to a rescission of the contract, and restoring what he may have received as the fruit of the agent's bad faith."

If the principal does not do so, the fraud of the agent becomes his fraud. We are unable to see, upon the application of any legal principle, in what manner Stuart could become liable to the bonding company, especially so in claiming the benefits of the acts of Stuart by retaining the money and the notes of Bomar and refusing to restore the same, "after it was fully informed of the fraud by which said money and said notes were obtained." When the principal knowingly adopted the active fraud of the agent, it was an active "particeps." The judgment of the trial court is reversed and rendered in favor of R. T. Stuart, on account of the judgment against him in favor of bonding company, and affirmed in all other respects.

Reversed and rendered in part and affirmed in part.