[No. 13819.  Department Two.  June 22, 1917.]

## MATT ENNIS, as Administrator etc., Appellant, v. NEW WORLD LIFE INSURANCE COMPANY, Respondent.[1]

EVIDENCE — PAROL EVIDENCE — TO VARY WRITING — ILLEGALITY — FRAUD.  Parol evidence contradicting a stock subscription is admissible upon an issue raised by the pleadings that the subscription contract was fraudulent as to subsequent subscribers and in violation of law.

CORPORATIONS—STOCK—SUBSCRIPTIONS—VALIDITY — FRAUD OF PROMOTERS.  A trust subscription contract, made for the benefit of the promoters and incorporators of an insurance company, is void and cannot be enforced against the corporation repudiating the same on notice from the insurance commissioner that it was discriminatory against other purchasers of stock, where it appears from a subsequent agreement that it was only optional, giving the incorporators the privilege of acquiring the stock in return for services in case the selling price should go to a premium, thereby making a secret profit, but otherwise attaching no liability to the subscription, although prima facie it was bona fide; since the promoters stand in a fiduciary capacity, and to hold such a subscription out to the public as binding was a fraud on future subscribers.

Appeal from a judgment of the superior court for Spokane county, Hon. Frank H. Rudkin, judge pro tempore, entered February 3, 1916, upon findings in favor of the defendant, dismissing an action to recover under a stock subscription contract.  Affirmed.

*Kenneth Durham* and *Oscar Cain*, for appellant.

*Thomas A. E. Lally* and *Graves, Kizer & Graves*, for respondent.

[1]Reported in 165 Pac. 1091.

FULLERTON, J.—Thomas J. Ennis was one of the promoters and incorporators, and a member of the directorate, of the Roman Catholic Life Insurance Company of America, the name of which was afterwards changed to the New World Life Insurance Company. Ennis, claiming under a subscription to corporate stock made in the name of E. J. Cannon, as trustee, began an action to recover the difference between his subscription price of the stock and its market value on October 7, 1913, the date on 'which the subscription was repudiated by the corporation. From a judgment dismissing his action, an appeal was taken. Pending appeal, the plaintiff died, and his brother, Matt Ennis, as administrator, was duly substituted as party plaintiff and appellant.

The appellant assigns as errors the action of the court, (1) in admitting parol evidence to vary the terms of the stock subscription contract; and (2) in holding the subscription contract unenforceable. The insurance company was organized on February 26, 1910, with a capital stock of $2,000,000, divided into 200,000 shares. There were seven incorporators who subscribed to the stock. By agreement between them, E. J. Cannon, as trustee, subscribed for 20,000 shares in addition to their regular subscriptions, which were to be held for the benefit of the incorporators. The subscription covered only 23,400 shares. The sale of the balance of 176,600 was to be promoted by the Columbia Finance Company, with which a contract to that effect was entered into by the insurance company. The incorporators, concluding afterwards that the company could not legally conduct business unless its full capital stock was subscribed, caused one of the incorporators, Thomas A. E. Lally, to make a *pro forma* subscription for the 176,600 shares which were to be handled by the finance company. The trust agreement between the incorporators was put into the following written form:

"This contract, made and entered into this 26th day of February, 1910, by and between Edward J. Cannon, party of

the first part, and Thomas A. E. Lally, Thomas J. Ennis, Henry B. Luhn, John J. Cadigan, Edward J. O'Shea, and Edmund Burke, parties of the second part, all of both parties being the entire incorporators and founders of the Roman Catholic Life Insurance Company of America; Witnesseth:

"(1)    That Edward J. Cannon, party of the first part, for and in consideration of the sum of one dollar to him in hand paid by the parties of the second part, receipt of which is hereby acknowledged, and for and in consideration of the association of all the parties hereto, and their incorporating the Roman Catholic Life Insurance Company of America, agrees to be, and is hereby declared to be trustee of twenty thousand shares of the capital stock of Roman Catholic Life. Insurance Company of America, for and in behalf of himself and the parties of the second part, as set out in the contract between said company and the Columbia Finance Company, a copy of which is hereto attached and marked Exhibit 'A,' and hereby made a part hereof.

"(2)    Said twenty thousand shares is reserved out of the remainder of the stock on hand after the sale of the first, second and third and fourth series or assignment as set out in said contract above mentioned and hereto attached.

"(3)    The method of apportioning and distributing said twenty thousand shares among the said seven incorporators of the Roman Catholic Life Insurance Company of America shall be as follows:    the proportion which the amount of stock that each of the above seven incorporators has purchased and is holding for himself in said company, at the time the said first, second and third and fourth series or assignments are sold, bears to the total amount so purchased and held by all of said seven incorporators is the ratio and proportion in which said twenty thousand shares shall be distributed among said seven incorporators.

"(4)    The distribution of said twenty thousand shares among the said seven incorporators shall be at any time after the sale of said first, second and third and fourth series or assignments of stock, as set out in the above mentioned contract hereto attached.    A certificate of stock shall be issued to each incorporator for the amount of his proportionate part of said twenty thousand shares immediately upon his payment to the Roman Catholic Life Insurance Company of

America of the price of twelve dollars and fifty cents per share for all of the stock to which he is so entitled.

"(5)  It is expressly understood that the right which each of said seven incorporators has, as beneficiary in this contract, cannot be assigned or disposed of to any one except to a member or members of the parties to this contract.

"(6)  That if any one of said seven incorporators disposes of all of his stock in the Roman Catholic Life Insurance Company of America before the sale of said first, second and third and fourth series or assignments shall have been completed, he loses all right and title to the benefit of this contract, and his interest so lost by him, shall revert to the remaining incorporators in proportion above mentioned; and if he shall have already assigned his interest and subsequent thereto, disposed of all his stock in said company, before the sale of said first, second and third and fourth series or assignment shall have been completed, such assignment shall be of no effect whatever."

Later the board of directors of the insurance company, composed of all the original incorporators except Ennis, who had withdrawn from the board, entered into the following agreement with themselves as individuals:

"(1)  Whereas on the 26th day of February, 1910, one certain agreement was executed by E. J. Cannon, as party of the first part, and John J. Cadigan, Edmund Burke, Thomas J. Ennis, Henry B. Luhn, Edward J. O'Shea, and Thomas A. E. Lally, as parties of the second part, all of whom are parties to this agreement, and all of whom are incorporators of company, which said agreement of February 26th, 1910, purported to set out the interests of the said parties in and to the said twenty thousand shares of the capital stock of company subscribed for by E. J. Cannon, trustee for and on behalf of said incorporators.

"(2)  Whereas, The said E. J. Cannon wishes to be relieved and to resign as trustee of said twenty thousand shares, and

"Whereas, The parties hereto wish to have the rights and interests of each of them in said twenty thousand shares definitely and correctly set out herein.

"Therefore, in consideration of the execution of this agreement by each party hereto, and in consideration of the sum

of one dollar ($1) paid by each party hereto to each of the other parties hereto, the receipt of which by each of whom is hereby acknowledged, and for other valuable and legal considerations, it is expressly understood and agreed:

"(3) That this agreement is substituted for and supersedes in every respect said agreement of February 26th, 1910; that the resignation of E. J. Cannon as trustee of said twenty thousand shares is hereby accepted by the parties hereto, and in his stead and place is hereby substituted 'The National Bank of Commerce of Spokane,' a corporation, hereinafter called 'Bank,' as hereinafter provided.

"(4) It is agreed and understood that the said incorporators are entitled, subject to the terms of this agreement, to the following respective parts of said twenty thousand shares:

"E. J. Cannon, five thousand shares (5,000)

"Thomas J. Ennis, five thousand eight hundred eighty-two shares (5,882)

"John J. Cadigan, two thousand nine hundred forty-two shares (2,942)

"Edmund Burke, one thousand one hundred seventy-six shares (1,176)

"Henry B. Luhn, two thousand nine hundred forty-two shares (2,942)

"Edward J. O'Shea, five hundred eighty-eight shares (588)

"Thomas A. E. Lally, one thousand four hundred seventy shares (1,470)

"(5) There shall be issued by company, seven (7) certificates of its capital stock in the respective amounts and to the respective parties as in the last preceding paragraph set out, and all of which certificates shall be delivered by said company to bank, to be held by it in escrow for and on behalf of the parties hereto as herein provided, each one of said certificates shall be marked thusly:

'This certificate is issued in escrow for the benefit of the party named herein, and title does not pass to said party in and to any part of the shares named herein, and no part of the same is assignable unless the terms of one certain contract of option executed by said party are complied with.'

"(6) At any time or times prior to September 1st, 1916, any of said incorporators may pay to company, or to bank,

for said company, $12.50 per share for any part or parts of at least fifty (50) or more shares of his share of said twenty thousand shares, at which time or times company shall issue to him a certificate, or certificates, for the amount or amounts so paid by him, and will cancel the certificate for his share of said twenty thousand shares so held by bank, and will issue and deliver to bank a new certificate marked as was the original, of his share still unpaid, which last mentioned certificate will be held by bank, as was the original certificate, and will be subject to the same provisions set out herein, until his share of said twenty thousand shares, shall have been fully issued to him; provided, however, if any of said twenty thousand shares remains unpaid after September 1st, 1916, the certificate or certificates therefor shall be delivered to company by said bank, and the original incorporators shall thereupon forfeit any and all right to them which they may have in and to that part so unpaid on said date; it being further understood and agreed that no title shall pass from company to any of said incorporators in and to any part of said twenty thousand shares unless and until said incorporators shall have fully performed the provisions of this agreement which by him should be performed.

"(7)    It is understood that this agreement is considered by company an option from it to the said respective incorporators to purchase their respective shares of said twenty thousand shares, according to the terms hereof, and that this agreement is executed by company in consideration of the services rendered and to be rendered by said incorporators to it and as above set out.

"(8)    This agreement and option is executed by all of the parties hereto in nine copies, each one of which is in its terms exactly like this one, one of which shall be retained by each of said incorporators, one by bank, and one by company.

"(9)    It is understood and agreed that no part of said twenty thousand shares shall be voted personally, or by proxy, at any corporate meeting of company, except that part which has been fully paid by any of the incorporators as herein provided, and it is further understood that the reasonable costs and expenses incurred in favor of bank by reason of its acting herein shall be paid by said original incorporators equally among themselves.

"(10)   It is further understood and agreed that this contract and option is not affected, nor is its operation and effect to be affected, governed or changed in any manner, by the liability of any of said incorporators to company, because of subscriptions made by any of them, to the capital stock of company at any time prior or subsequent to the execution of this indenture." Dated September 9, 1911.

At the trial respondent, over the objection of appellant, introduced the testimony of five of the parties to the trust subscription, for the purpose of showing that the contract was in fact an option and not intended to impose an obligation on the subscribers.   The court's ruling admitting the evidence was upon the ground that the whole matter was open to parol testimony, inasmuch as appellant was compelled to establish his interest in the subscription contract by parol. Whether or not parol was admissible on that ground, we think it was admissible on the issues raised by the pleadings, that the subscription contract was fraudulent as to subsequent subscribers and was violative of the statutes of this state respecting the organization of insurance companies. Where fraud or illegality inheres in a stock subscription contract, that fact may be shown by parol. *Anderson v. Scott,* 70 N. H. 350, 47 Atl. 607; *Hinkley v. Sac Oil & Pipe Line Co.,* 132 Iowa 396, 107 N. W. 629, 119 Am. St. 564; *Turner v. Grobe* (Tex. Civ. App.), 44 S. W. 898; *Collins v. Southern Brick Co.,* 92 Ark. 504, 123 S. W. 652, 135 Am. St. 197; *Commonwealth Bonding & Casualty Ins. Co. v. Bomar* (Tex. Civ. App.), 169 S. W. 1060.

Respecting the illegality of the subscription, the evidence showed that, for a period of three and one-half years, no payment was made on the subscription contract by its trustee, while all new subscribers to stock were required to pay up in full within sixty to ninety days after subscribing.   By the terms of the agreement between the insurance company and the finance company, the trustee subscription was to be held in abeyance until 100,000 shares had been disposed of, which figure had not been reached on October 1, 1913, the date on

which the respondent repudiated the trustee subscription. This repudiation was due to the fact that the state insurance commissioner had notified the company that the trust subscription agreement was a discrimination against the other purchasers of stock in favor of the directors of the company and a violation of the insurance code. That the incorporators of the company, in making their trustee subscription, in addition to those made in their individual capacities, intended to subject themselves to a merely optionable liability is clearly shown by their subsequent agreement attempting to fully define the arrangement as they understood it. In the agreement of September 9, 1911, they expressly declare:

"It is understood that this agreement is considered by company an option from it to the said respective incorporators to purchase their respective shares of said twenty thousand shares, according to the terms hereof, and that this agreement is executed by company in consideration of the services rendered and to be rendered by said incorporators to it and as above set out."

Under this agreement, the *cestuis que trustent* were given five years in which to have the privilege of exercising the option. The evidence shows that this block of stock was set aside for the benefit of the promoters, as a sort of perquisite to be availed of if the selling price of stock should go to a premium, but that otherwise no liability would attach on the subscription. Though *prima facie* a *bona fide* subscription, it was not such in fact, but was void as to subsequent subscribers; it was notice to the investing public that the 20,000 shares in question were actually subscribed, when they were not; and it provided for the reservation of a secret profit to the promoters to the exclusion of the other shareholders in the capital stock. At the time appellant brought his action, shares were selling at $7.50 in excess of cost price, which on 20,000 shares would amount to $150,000. On the basis of an advance of $12.50 in the value of shares, appellant claims his damages as amounting to $73,512.50. The mere state-

ment of these figures indicates that the loss to other stock-holders is no immaterial matter, and that the secret profit arranged by the promoters for their own benefit would have been considerable.

Without going into the details of all the evidence, which is voluminous, we think enough has been set out to stamp the transaction as one designed to obtain an unfair advantage over other stockholders. It was one made by the promoters of the corporation and ratified by themselves as the board of directors of the organization.

The cause was tried before the Honorable Frank H. Rudkin, judge of the United States district court for the eastern district of Washington, who was called in as judge *pro tem* for the purpose of the trial in the superior court of Spokane county. In dismissing the action, he wrote an opinion which concisely analyzes the evidence and succinctly states the governing principles of law. From that opinion, we quote as follows:

"In my judgment the case might well be disposed of without considering any disputed questions of fact; but I will nevertheless refer briefly to some conflicts in the testimony. The plaintiff testified that the basis of apportioning the trust stock was agreed upon by all the incorporators before the subscription was actually made. In this he is not supported by the testimony of the other parties in interest. One of them testified that he was under the impression that an agreement or understanding of that kind existed; but he had no independent recollection of the facts or of anything that was said. On the other hand the other five incorporators testified positively that the mode of distribution was never discussed or agreed upon until at or about the time of the execution of the first written contract some months later, and that instrument, it will be recalled, distributes the stock on a slightly different basis. But as a matter of fact it is apparent from the record that little was said or thought about the trust subscription at the time it was made. The reason for this indifference is not far to seek. The parties were agreeing to pay twenty-five per cent above par for the stock of a two million dollar corporation whose assets consisted in a corpo-

rate name, the right to exist, and an executory contract for the sale of its stock. Few if any of the incorporators knew or appreciated that they were incurring personal liability by reason of the trust subscription and the prospect of future gain was too remote to incite interest or even curiosity. Their view doubtless was that if the enterprise succeeded and the stock advanced beyond $12.50 per share they would profit to the extent of the increase; but the thought that they might or could suffer a loss never occurred to them. Whether their view of the law or of the obligation assumed was correct, is another question. I am fully satisfied, therefore, that if the question of apportioning the trust stock came up for consideration at all it was only discussed between the plaintiff and one of the other incorporators and was never agreed upon or assented to by all until at or about the time of the execution of the written contract. This question is perhaps of little moment inasmuch as the allegation of the complaint relating to the apportionment of the trust stock was not denied by the answer; but it none the less has some bearing upon the credibility of the witnesses and the weight of the testimony. Again the plaintiff testified that he had made all arrangements to take up and pay for his portion of the trust stock which would involve an outlay of upwards of $70,000, all or more than he was actually worth. This testimony seems utterly incredible. Why the plaintiff should expect or apprehend that the trustees of this corporation would make a call upon themselves for a quarter of a million dollars is incomprehensible to me. The probability, or even the possibility that such a call would be made is rebutted by every fact and every circumstance in the case. It is conceded that each of the incorporators was solicited to make his individual subscription as large as possible, and that each of them did so; and if the trust subscription was made on the same terms, and conditions, and subject to the same liabilities, well may we ask why was there a trust subscription at all. If the several incorporators were unable or unwilling to take more than thirty-four hundred shares in the aggregate why should they obligate themselves to take more than five times that number under the guise of a trust subscription? But these questions are answered by the record. The trust subscription was not made subject to the same terms and conditions as the individual subscriptions, and this fact was well understood. The

agreement with the Finance Company, executed on the same day, reserved from the remainder of the stock, after the completion of the sale of the first, second, third and fourth assignments, the twenty thousand shares of trust stock in question. This reservation shows very clearly that no one contemplated that the trust stock would be taken up or paid for until after the sale of one hundred thousand shares of the other stock, ten thousand shares at $12.50 per share; ten thousand shares at $15 per share; thirty thousand shares at $17.50 per share, and fifty thousand shares at not less than $17.50 per share. The agreement entered into some time late in 1910, but dated back to February 26th of that year, also provided that the trust stock should be distributed after the sale of the first four assignments. The last agreement of September 9th, 1911, by its terms superseded all prior agreements on that subject and provided that the trust stock might be taken up at any time prior to September 1st, 1916. As already stated, this latter agreement was a mere option imposing no obligation whatever upon the subscribers. Let us now examine briefly these different contracts and see if they gave the stockholders of the trust stock any advantage over other stockholders. While no formal call on the stockholders was ever made, it is admitted that the individual subscriptions of the incorporators were to be paid and the stock taken up immediately, or at least within a reasonable time, and that this was done. It is further admitted that the stock sold by the Finance Company was paid for in full within ninety days from the date of sale, one-fourth upon the day of sale and the balance within ninety days thereafter. Let us compare the situation of these stockholders with the subscribers to the trust stock. When the contract of September 9th, 1911, was entered into the stock of the company was selling readily at from fifteen to twenty dollars per share, and the plaintiff avers in his complaint that as early as October 17, 1913, it was of the reasonable value of $25 per share, yet the trustees of the corporation granted themselves an option to purchase the stock, extending over a period of three years, for $12.50 per share. The invalidity of this agreement, standing alone, is so apparent that the plaintiff does not attempt to uphold it, and I will not discuss it. True, he was not an officer of the corporation at that time, but the agreement simply carried out the details of arrangements

made while he was an officer.   The plaintiff, however, does not
refer to or rely on this agreement.   He plants himself square-
ly on the subscription contract and in effect says to the court,
the contract is plain and free from ambiguity; it is enforce-
able against the subscribers, and therefore it may be enforced
by them.   In some respects his position is correct, and in
others it is not.   Possibly the subscription might be enforced
against the subscribers; but that is at least a debatable ques-
tion.   Under the laws of this state a corporation cannot en-
force subscriptions to its capital stock until the capital stock
has been fully subscribed for.   *Denny Hotel Co. v. Schram*, 6
Wash. 134, 32 Pac. 1002, 36 Am. St. 130.

"There was no *bona fide* subscription to the capital stock
of this corporation outside the twenty-three thousand four
hundred shares, conceding that the trust subscription was a
*bona fide* one, until long after the trust subscription was
made.   The subscription to the balance of the stock was mere-
ly formal to perfect the organization of the company, and
that fact appears on the face of the subscription itself. Fur-
thermore, the officer who made the formal subscription testi-
fied at the trial that he was not financially able to take care
of even his small portion of the trust subscription.   The first
*bona fide* subscription to the stock was therefore made by the
parties who purchased it through the Finance Company, and
it may well be urged that the trust subscription could not be
enforced until all the stock was subscribed and paid for at
prices greatly in excess of $12.50 per share.   But conceding
that the subscription might be enforced against the trustee
and his *cestuis que trust*, it does not follow that it may be en-
forced by them.   A contract made by a trustee with himself,
in violation of his trust is always enforceable against him be-
cause he will not be heard to assert its invalidity; but it is
almost universally held voidable at the instance of those whose
rights are prejudiced thereby.   Furthermore, the subscrip-
tion in this case lacks many of the essential elements of the
ordinary contract.   The corporation could only act and
speak through its authorized officers, and these officers were
contracting and dealing with themselves.   It is a universal
rule of law that such contracts are closely scrutinized, and if
it appears that the trustee gained an advantage over other
parties for whom he was acting as trustee the contract is void-
able at their option.

"In executing this mortgage and thereby securing to themselves advantages which were not common to all the subscribers, they were guilty of an unauthorized act, and violated a plain principle of equity applicable to trustees. 'The directors are the trustees or managing partners, and the stockholders are the *cestuis que trust*, and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy.' *Koehler v. Black River Falls Iron Co.*, 2 Black 715, 721.

"But this rule of law is elementary and is supported by all the authorities, English and American, state and federal. Many cases are cited in the briefs; but the question involved is essentially one of fact. That question is, did the trustees of this corporation, by their contracts gain an advantage over other stockholders of the corporation? This question admits of but one answer. It is frankly conceded by the defendant that the trustees were guilty of no intentional wrong, and that concession is fully borne out by the testimony. They no doubt felt that they were hazarding their money in an enterprise which might fail, and that if the enterprise succeeded, they were entitled to some consideration for their efforts. But it must be remembered that other parties who purchased stock before the success of the enterprise became an assured fact took the same risk and were entitled to the same consideration. Conceding that the trustees were guilty of no moral wrong, yet they were plainly obtaining an advantage over other stockholders whose rights and property they held in trust, and their act in so doing is condemned by the law on grounds of public policy. Under such circumstances good intentions and honesty of purpose are of no avail.

"Perhaps it will be unnecessary to make any findings in view of the fact that there will be no affirmative judgment to support; but if the parties deem it necessary the only finding I will make will be that the trust subscription and all subsequent contracts gave the trustees an advantage over other stockholders and for that reason are nonenforceable. Let findings and judgment be submitted accordingly."

We adopt the foregoing opinion of the learned judge as the proper rule for the decision of the action. It is settled

law that the promoters of a corporation stand in a fiduciary relation to the corporation, and are bound by the principles governing persons acting in a fiduciary capacity. It has been held that the gratuitous issue of corporate stock by promoters to themselves is a fraud on existing stockholders. *Hughes v. Cadena De Cobre Min. Co.*, 13 Ariz. 52, 108 Pac. 231. While no stock was issued in the present case, nor was it the intention that it should be gratuitous, the promoters had arranged for its issuance at a profit to themselves, which virtually made the issue gratuitous, sufficiently so at least to bring the transaction within the principles announced in the *Hughes* case. See, also, *Hinkley v. Sac Oil & Pipe Line Co.*, 132 Iowa 396, 107 N. W. 629, 119 Am. St. 564.

In 1 Thompson on Corporations (2d ed.), § 104, it is said:

"From this fiduciary relation it follows that the promoters must deal with the persons who come into the organization as members or stockholders, in the utmost good faith. . . . Neither will they be permitted, either by fraud or silence, to use their position for the purpose of speculation. The general rule conceded and adopted by the authorities is that under such circumstances promotors cannot take advantage of their position to make secret profits out of their transactions with or on behalf of the proposed corporation or the corporators. . . . 'Justice demands that the promoters of the company should not abuse the confidence placed in them by the stockholders, or derive any unjust advantage through their control over the organization or management of the company.' . . . If the promoters obtain secret profits out of any transactions, and either they themselves become members of the board of directors, or persons under their control are elected as such directors, and the board thus composed adopts and ratifies the voidable transaction,—this, it has been held, will create no impediment to proceedings by stockholders for redress."

While the transaction involved in this action is not, strictly speaking, one falling within the class of cases usually dealing with what are called "secret profits," it comes within the principle of those cases, for the reason that the subscription

was made with the object in view of reaping a profit in the future at the expense of the other stockholders. See: *Mangold v. Adrian Irr. Co.*, 60 Wash. 286, 111 Pac. 173; *Yeiser v. United States Board & Paper Co.*, 107 Fed. 340; *Dickerman v. Northern Trust Co.*, 176 U. S. 181; *Davis v. Las Ovas Co.*, 227 U. S. 80; *Chandler v. Bacon*, 30 Fed. 538; *Brewster v. Hatch*, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. 498; *Pietsch v. Milbrath*, 123 Wis. 647, 101 N. W. 388, 102 N. W. 342, 107 Am. St. 1017, 68 L. R. A. 945; *De La Motte v. Northwestern Clearance Co.*, 126 Minn. 197, 148 N. W. 47; *Torrey v. Toledo Portland Cement Co.*, 158 Mich. 348, 122 N. W. 614; *Tooker v. National Sugar Refining Co.*, 80 N. J. Eq. 305, 84 Atl. 10; *Parker v. Boyle*, 178 Ind. 560, 99 N. E. 986.

The optional subscription in the name of the trustee was made with no intention of enforcing it in case the company was not a success. It was held out to the public as a binding subscription, and thus a fraud on future subscribers, who would in all probability subscribe on the strength of the optional subscription. One for whose benefit such a fraudulent subscription was made could not enforce it against the corporation or its stockholders. *Getty v. Devlin*, 54 N. Y. 403; *White Mountains R. Co. v. Eastman*, 34 N. H. 124.

In the latter case, Eastman subscribed for thirty shares of stock, with a secret agreement with the directors that he should have an option to reduce his subscription to five shares. In passing upon the character of the transaction, the court said:

"It is the secret stipulation alone which operates in fraud of others, and upon *that* the law leaves the parties where they stand; declining to enforce it for the benefit of either; while, as to the other part of the contract [the stock subscription], to enforce it between the parties is what is necessary to defeat their fraudulent purpose as to other innocent persons. That the proceeding is a fraud upon third persons is clear from the relation in which subscribers for stock in a corporation of this kind stand toward each other. In the subscription of

each person, every other subscriber has a direct interest. Their respective subscriptions are contributions or advancements for a common object. The action of each in his subscription may be supposed to be influenced by that of the others, and every subscription to be based upon the ground that the others are what upon their face they purport to be."

We think the findings and conclusions made by the trial court were supported by the evidence, and that there was no error in the admission of parol evidence designed to show the fraudulent character of the trustee's stock subscription.

The judgment dismissing the action is affirmed.

ELLIS, C. J., HOLCOMB, MOUNT, and PARKER, JJ., concur.